**UNITED STATES of America, Appellee,**

v.

**Patrick DeFILLIPO and James DeFillipo, Appellants.**

**Nos. 216, 217, Dockets 78–1217, 78–1218.**

United States Court of Appeals, Second Circuit.

Argued Oct. 10, 1978.

Decided Jan. 8, 1979.

Lawrence Stern, Brooklyn, N. Y., for appellant James DeFillipo.

Donald E. Nawi, New York City, for appellant Patrick DeFillipo.

Paul F. Corcoran, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty. for the Eastern District of New York, Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before LUMBARD, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Appellants were prosecuted on two counts for receiving and possessing goods stolen in interstate commerce, in violation of 18 U.S.C. § 659, and for conspiring with each other and with three codefendants to receive stolen goods, in violation of 18 U.S.C. § 371. The DeFillipos, who are brothers, were each convicted on both counts after a jury trial in the United States District Court for the Eastern District of New York, Jacob Mishler, Chief Judge. They were sentenced to two years' imprisonment on the conspiracy charge, to be served consecutively to sentences previously imposed in the District of New Jersey for another crime involving similar charges in connection with stolen Yves St. Laurent suits, of which more later; the possession charge carried no sentence of imprisonment, only a five-year probation term. On this appeal appellants raise six points, three of which were decided adversely to their three codefendants in an affirmance from the bench in *United States v. Santa*, 578 F.2d 1372 (2d Cir. 1978).[1] We find none of the six grounds of sufficient merit to warrant reversal.

---

1. Affirmances from the bench do not have precedential value. We are therefore required to consider each of these contentions afresh.

At about 9:00 p. m. on March 11, 1975, a T.I.M.E.–D.C. Trucking Corporation tractor-trailer carrying interstate 6,910 cartons of Schick shaving products with a retail value in excess of $400,000 was hijacked near Parsippany, New Jersey. Less than forty-eight hours later agents of the Federal Bureau of Investigation (FBI) executed a search warrant at the CBS warehouse in Brooklyn, New York, and recovered 5,072 cartons of the stolen products. The FBI recovered an additional 1,783 cartons later that day at the S & F warehouse in Brooklyn. The operators of the CBS warehouse were convicted for unlawfully receiving and possessing the cartons found there, and their convictions were affirmed in *United States v. Kahan*, 572 F.2d 923 (2d Cir.), *petition for cert. denied*, —— U.S. ——, 99 S.Ct. 112, 58 L.Ed.2d 128 (1978).

The Government charged that the DeFilipo brothers unlawfully possessed the stolen products and conspired with Vincent James Santa, Joseph DeLuca, and Manuel Gomez to possess them. Paul Pollari, a Government informer, testified that at about 7:30 p. m. on March 11, 1975, an hour and a half *before* the hijacking, appellant James DeFillipo telephoned him and told him that they had "work" the next day, which Pollari understood to mean "an unloading job." Early on the morning of March 12 Pollari met with appellants and codefendant Gomez, and they proceeded to Tony's Gulf Station in Brooklyn where Gomez obtained three rental vehicles, two trucks and a van. The four men proceeded to the Zimco truck lot and met codefendant Santa, who directed them to the middle of the lot where they found the stolen T.I.M.E.–D.C. trailer, "buried amongst a whole bunch of trailers." Codefendant DeLuca was also present in the lot. The doors of the trailer were open, revealing a full load of Schick products.

Appellants, Santa, DeLuca, Gomez, and Pollari unloaded the Schick products into one rental truck. Santa directed Gomez and Pollari to deliver the first truckload to the S & F warehouse and also indicated that the DeFillipos were going to the CBS warehouse. Gomez and Pollari spent the rest of the day at the S & F warehouse partially unloading the stolen merchandise, and when they returned to the Zimco lot they reloaded their truck with the help of Santa and DeLuca who were the only ones there. The jury might have inferred that the DeFillipos were busy at the CBS warehouse. On the following morning, March 13, Pollari met with Gomez and the DeFillipos at a diner in Queens. Pollari and Gomez later proceeded to the CBS warehouse with the reloaded truck again full of stolen Schick products. The DeFillipos arrived a few minutes later in two vans, one previously mentioned which Gomez had obtained on March 12 and the second which DeLuca had apparently obtained under his own name. Pollari, Gomez, and the DeFillipos spent the afternoon of March 13 unloading more products at the CBS warehouse.

The FBI had this unloading under surveillance as a result of information that Pollari had given to the FBI on the previous evening. The surveillance confirmed that the DeFillipos arrived in their two vans and joined Gomez and Pollari in unloading all three vehicles. The agents, who had seen the DeFillipos on prior occasions, positively identified them and also observed what appeared to be identification numbers on the cartons. The FBI later obtained a search warrant and recovered the stolen products at both the CBS and the S & F warehouses.

After delivery of the stolen goods to the CBS warehouse, Pollari and the DeFillipo brothers went to Robert's Lounge in Queens and then to the house of one Tommy DeCandia where they met Santa and DeLuca. Santa informed them that "the FBI had hit" the CBS warehouse. When Pollari in the presence of the DeFillipos asked Santa whether there was anything to worry about, Santa said, "No, the problem was probably on the other end," presumably referring to the warehouse operators. Santa paid Pollari and appellants $700 each for their unloading efforts, fairly healthy pay for two days' work. The court also admitted testimony by Pollari that a few days later he overheard Santa state that "we already got $20,000 from [the warehouse

operators] and we ought to get another $20,000 because it was probably their fault."

Another Government informer, Thomas Cogar, also testified to conversations about the hijacking. On the evening of March 12, Cogar met Gomez at DeCandia's house, and Gomez later informed Cogar that "they had just made a $500,000 score." A few days later, while Cogar helped Gomez return a rental car, Gomez disclosed that he had used the car "on a razor blade job." Additionally, on or about March 14, the day after the stolen products were seized and the warehouse operators arrested, Cogar overheard a conversation between Santa and Stanley Diamond, who subsequently entered a plea of guilty to the conspiracy count in a prior indictment naming appellants. In this conversation, as Santa handed Diamond a newspaper article describing three people apprehended with a load of stolen shaving products, Santa asked Diamond what he thought of the warehouse operators. Diamond told him "not to worry, they are tough people, they will stand up." Finally, Cogar testified that later that week he again met with Santa, Diamond, and Gomez at DeCandia's house. According to Cogar, Diamond asked Santa if he was going to get any more money from the warehouse operators and told Santa that he, Diamond, needed the money. Santa said that he would meet the warehouse operators on the following Saturday. Diamond also told Gomez that the warehouse operators had made payment in new hundred-dollar bills with certain specific wrappers.[2]

The Government presented various documents and expert witnesses to corroborate the testimony of the informers. The Government also obtained admission of a prior conviction of the DeFillipos in the District Court for the District of New Jersey establishing that on December 2, 1974, the DeFillipos, together with Santa and DeLuca, unlawfully possessed a quantity of Yves St. Laurent suits that had been stolen from interstate commerce.

Of appellants' six arguments, three were, as stated above, presented by their codefendants in the *Santa* case: (1) their conviction for the instant March, 1975, conspiracy to possess the stolen Schick shaving products placed them twice in jeopardy because they had previously been convicted of conspiracy to possess the stolen Yves St. Laurent suits, and the conspiracy was a continuing one; (2) the court erroneously admitted hearsay testimony of Cogar about Gomez's utterances outside the purposes of the charged conspiracy and Diamond's utterances without sufficient independent nonhearsay evidence that Diamond participated in the conspiracy; (3) the district court erred in finding that they lacked standing to challenge the March 13, 1975, search of the CBS warehouse and in holding that the affidavit underlying the warrant was sufficient. Appellants raise three issues not previously dealt with by the *Santa* court: (4) Patrick claims that the court denied his right to counsel by permitting a single attorney to represent him and his brother at trial; (5) appellants argue that the charge was erroneous because it (A) permitted the jury to infer guilty knowledge from recent possession of stolen property and (B) foreclosed the jury from considering material impeaching the Government's witness; and (6) appellants complain that the court should not have admitted as a similar act of evidence of the conviction for possession of the Yves St. Laurent suits.

## I. DOUBLE JEOPARDY

■ Because the gist of the crime of conspiracy under 18 U.S.C. § 371 is the

---

2. In *United States v. Kahan*, 572 F.2d 923, 933 (2d Cir.), *petition for cert. denied,* —— U.S. ——, 99 S.Ct. 112, 58 L.Ed.2d 128 (1978), the court rather aptly characterized Cogar's testimony as to overheard conversations as follows:

The testimony, relevant to the conspiracy count, if admissible at all, was of the sort Judge Friendly commented on in [*United*

*States v.*] *Leonard* [524 F.2d 1076, 1084 (2d Cir. 1975)]:

". . . the prosecutor chose to imperil a good case by introducing a line of evidence that added little but was bound to be a prolific breeder of substantial claims of error . . ."

agreement of the conspirators to commit one or more unlawful acts, with one of the parties doing an overt act to effectuate the conspiracy, *Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942), the Government may not prosecute a defendant for conspiracy twice on the basis of a single agreement to commit two crimes without running afoul of the prohibition against double jeopardy. *Id.; see United States v. Mallah,* 503 F.2d 971, 987 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). Appellants argue, for the first time on appeal, that double jeopardy bars their prosecution and consecutive sentence for the March, 1975, Brooklyn, New York, conspiracy to possess stolen Schick products because they already had been convicted of conspiring to possess goods stolen in the Yves St. Laurent hijacking, which occurred three months earlier in New Jersey and involved essentially the same conspirators.

Although there is authority in this circuit that a defendant forfeits a double jeopardy claim if he does not affirmatively plead his claim at trial, *United States v. Perez,* 565 F.2d 1227, 1232 (2d Cir. 1977); *see* Fed.R. Crim.P. 12(b) and (f),[3] the defendant might be able to raise the claim as an objection to consecutive sentences.[4] We need not resolve this rather thorny issue here, however, for we find that the double jeopardy claim is unconvincing on its merits.

In arguing that the 1974 and 1975 conspiracies were the same offense for double jeopardy purposes,[5] appellants rely upon *United States v. Mallah, supra. Mallah* reversed a narcotics conspiracy conviction on double jeopardy grounds, holding that it involved the same offense as an earlier conspiracy conviction. The two indictments charged the defendant with entering a conspiracy on precisely the same date and with committing overt acts in the same city, although some of the coconspirators were different. The court held that "[t]he government cannot argue that the courts must take a broad view of the scope of a conspiracy for the purpose of *Kotteakos* [*v.*

---

**3.** Although Fed.R.Crim.P. 12 is not explicit on the point, it probably requires a defendant to raise a double jeopardy claim before the end of trial. *See* Westen, *Away from Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure,* 75 Mich.L.Rev. 1214, 1249–50 (1977).

**4.** There are two possible answers to the contention that appellants have "waived" their double jeopardy claim here. Under *Natarelli v. United States,* 516 F.2d 149, 152 & n.4 (2d Cir. 1975), a defendant may move on double jeopardy grounds to vacate his sentence under 28 U.S.C. § 2255, even though he has not raised the claim on direct appeal, because the court may consider his § 2255 motion as a motion to correct an illegal sentence under Fed.R.Crim.P. 35, which a petitioner may make at any time. Here, arguably, we might ignore the form of this appeal and view it as a Rule 35 motion because again "the claim goes to the illegality of the sentence itself, and not to trial errors tainting the underlying conviction." *Id.* We note, however, that *Natarelli* is somewhat inapposite here because of the difference in the procedural posture of this case. In *Natarelli,* the defendant could not have raised his double jeopardy claim before sentencing; for the judge might have avoided double jeopardy problems by imposing a sentence on only one count. Here, by contrast, if appellants' double jeopardy claim were valid, *any* sentence would be

impermissible. Because the claim became viable as soon as the "second" conspiracy indictment was returned, it is somewhat artificial to interpret appellants' claim as an attack on the legality of the sentence.

Moreover, *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), and *Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (per curiam), guilty plea cases, suggest that some constitutional rights may be asserted despite failure to raise them prior to the plea. A sophisticated analysis of these cases, *see* Westen, *supra* note 3, at 1235–39, interprets them as permitting defendants to reassert constitutional defenses that they had forfeited, absent undue prejudice to the Government, by the reassertion of the claims. *Id.* at 1249–52. Professor Westen would apply this analysis to the defense of double jeopardy, casting doubt on the constitutionality of Fed.R. Crim.P. 12 insofar as it requires assertion of the defense before the end of trial.

**5.** We note that appellants are asserting the reverse of the usual argument in conspiracy cases that the defendant has been erroneously charged with participation in a single conspiracy rather than in multiple conspiracies. *See* Note, *Resolution of the Multiple Conspiracies Issue via a "Nature of the Enterprise" Analysis: The Resurrection of Agreement,* 42 Brooklyn L.Rev. 243 (1975).

*United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946),] and a narrow view of the offense for the purpose of answering the ultimate question in this double jeopardy claim." 503 F.2d at 984–85.[6] The court approved the standard set in *Short v. United States,* 91 F.2d 614, 624 (4th Cir. 1937):

> If the government sees fit to send an indictment in this general form charging a continuing conspiracy for a period of time, it must do so with the understanding that upon conviction or acquittal further prosecution of that conspiracy during the period charged is barred, and that this result cannot be avoided by charging the conspiracy to have been formed in another district where overt acts in furtherance of it were committed, or by charging different overt acts as having been committed in furtherance of it, or by charging additional objects or the violation of additional statutes as within its purview, if in fact the second indictment involves substantially the same conspiracy as the first . . . .

*Id.* at 985.

Here, however, two distinct hijackings occurred, one in late 1974, involving Yves St. Laurent suits, the other in early 1975, involving Schick products. The Government's charges were narrowly drawn, carefully limited in time and place. The dates in the two indictments do not overlap, and the indictments name some different conspirators.[7] There is no indication in the evidence available to the Government or in this record of a continuing conspiracy to commit separate hijackings. For all that appears

there was one agreement, which culminated in the successful Yves St. Laurent suit hijacking, followed by a new agreement, in which essentially the same people came together to plan another truck hijacking.

■ Appellants argue, however, that because the Government requested the admission at trial of the prior conviction as evidence of a "common scheme or plan," it has "conceded" or is "estopped" by its request to deny that there was a single conspiracy. But the Government's trial request, which was to admit evidence of the conspiracy as a similar act, is not at all inconsistent with its present position on the double jeopardy claim. The admissibility at trial of the prior conspiracy as a similar act implies only that the conspiracy is relevant to the issues in this case of intent and knowledge and not that it is *so* closely similar to the conspiracy at trial that it is the "same offense" for double jeopardy purposes.

Under the traditional test that offenses are the same for the purposes of the double jeopardy guarantee only when "the evidence required to support a conviction upon one of [the indictments] would have been sufficient to warrant a conviction upon the other," *United States v. Kramer,* 289 F.2d 909, 913 (2d Cir. 1961),[8] appellants would clearly be foreclosed: as the indictments were framed, the evidence in the New Jersey case would have been insufficient to warrant a conviction in the case at bar, and vice versa. As in *United States v. Bommarito,* 524 F.2d 140 (2d Cir. 1975), how-

---

**6.** The rule of *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), is that "a defendant has a right not to be tried *en masse* for a conglomeration of distinct offenses committed by others." *United States v. Mallah,* 503 F.2d 971, 984 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

**7.** The New Jersey indictment charged that between October, 1974, and December 2, 1974, the DeFillipos conspired with Stanley Diamond, Jimmy Santa, Joe DeLuca, Morris Spiers, and Michael Scarano to possess 120 cartons of Yves St. Laurent suits stolen while moving from Paris, France, to Secaucus, New Jersey. The present New York indictment charges that

"on or about and between the 10th day of March, 1975 and the 19th day of March, 1975," the DeFillipos conspired with Santa, DeLuca, John Savino, Manuel Gomez, and others not named to receive Schick shaving products stolen from a tractor-trailer moving interstate from West Haven, Connecticut, to Anaheim, California. The overt acts alleged in each indictment were entirely different.

**8.** The *Kramer* formulation in turn stemmed from Chief Justice Shaw's view in *Morey v. Commonwealth,* 108 Mass. 433, 434 (1871), *quoted with approval* in *Ex parte Nielsen,* 131 U.S. 176, 187–88, 9 S.Ct. 672, 33 L.Ed. 118 (1889).

ever, we need not rest our holding on this ground. As Judge Friendly recognized in his opinion for the court in *United States v. Cioffi*, 487 F.2d 492, 496–97 (2d Cir. 1973), this "same offense" test has been seriously criticized. In particular, Mr. Justice Brennan has insisted that the Supreme Court consider anew what constitutes the "same offense" for double jeopardy purposes. *See id.* at nn. 4 & 5.[9] The Government, in fact, as a matter of "fairness," has avoided the problem in some cases by requesting the dismissal of convictions arising out of the same transaction as a previous conviction, *e. g., Marakar v. United States*, 370 U.S. 723, 82 S.Ct. 1573, 8 L.Ed.2d 803 (1962); *Petite v. United States*, 361 U.S. 529, 530, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960). Here, appellants' double jeopardy claim fails even the transactional test, for the record does not indicate either that the several offenses arose out of a single transaction or that there was one continuing conspiracy.

Finally, we note the difference between the offense involved here, conspiring to receive goods stolen in an interstate hijacking, and the narcotics conspiracy involved in *Mallah*; the nature of that enterprise was continuous. *See United States v. Mallah, supra*, 503 F.2d at 987. Although interstate hijackings are not exactly "Mom and Pop" businesses, as phrased in *Mallah*, and may indeed be directed by criminal syndicates, there is no indication that these hijackings were part of a continuing scheme or enterprise. In conclusion, because appellants' attempted proof that the 1974 and 1975 conspiracies were pursuant to the same agreement is insufficient to establish any presumption that the Government must rebut, *see United States v. Bommarito, supra; United States v. Barzie*, 433 F.2d 984, 985 (2d Cir. 1970) (per curiam), *cert. denied*, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971), we hold that their conviction for this second conspiracy did not violate their right not to be twice tried for the same offense.

## II. HEARSAY STATEMENTS OF STANLEY DIAMOND

Appellants' next point is that the district court committed reversible error in permitting the informer Cogar to testify to statements that Stanley Diamond made evidencing the nature and scope of the conspiracy.[10] Appellants rely upon *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), the leading case in this

---

9. In *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), the Supreme Court reaffirmed that " 'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not . . . .' " *Id.* at 166, 97 S.Ct. at 2225, *quoting Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Thus, the Court held that the double jeopardy clause generally forbids successive prosecution and cumulative punishment for a greater and lesser included offense. But the Court noted that a different test might be appropriate in cases such as ours where the question is not whether two offenses are, in the abstract, sufficiently different to permit the imposition of consecutive sentences but whether double jeopardy will bar a second prosecution because it requires the relitigation of factual issues already resolved by the first. 432 U.S. at 166 n.6, 97 S.Ct. 2226. The Court in *Brown* recognized that it had not strictly applied the *Blockburger* test in cases like the one at bar but found it unnecessary to state the proper test.

10. Appellants also object to the admission of Cogar's testimony as to certain statements of Manuel Gomez. Appellants, however, failed to raise this objection at trial. Thus we will not consider the objection on appeal because it does not rise to the level of plain error under Fed.R.Crim.P. 52(b).

Appellant James DeFillipo argues further that in the context of his assertion that he was only a hired laborer without knowledge that the Schick products were stolen, the trial court's restriction of his cross-examination of the informant Pollari deprived him of a fair trial. The court indicated that if the defense sought to establish that the Government was supporting Pollari at the time of trial (presumably to show his bias in favor of the Government), the court would allow the Government to show that Pollari was enrolled in the Witness Protection Program. We think that the court's ruling was correct: Pollari's inclusion in the Program would explain why he was receiving Government support payments and rebut any inference that the Government was buying his testimony.

circuit interpreting the rule of *Glasser v. United States*, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942), that although hearsay declarations are admissible against a coconspirator, independent nonhearsay evidence must establish the participation in the conspiracy of the person against whom they are admitted. The court may admit the hearsay evidence provisionally, "subject to connection," [11] but must ultimately find that the participation of the defendant against whom the declaration is offered is established "by a fair preponderance of the evidence independent of the hearsay utterances." *United States v. Geaney, supra,* 417 F.2d at 1120. As *Glasser* points out, if declarations were admissible over the objection of an alleged coconspirator when there was no proof *aliunde* that he was connected with the conspiracy, "hearsay would lift itself by its own bootstraps to the level of competent evidence." 315 U.S. at 74–75, 62 S.Ct. at 467.

■ Here, appellants, whose participation in the conspiracy was amply shown by independent evidence under *Geaney-Glasser,* would read the rule as further requiring independent nonhearsay proof that the *declarant* participated in the conspiracy. We need not determine this question here, however.[12] Even assuming that there was insufficient independent evidence that the declarant Stanley Diamond participated in the conspiracy to admit his statements under the coconspirator exception to the hearsay rule,[13] we reject appellants' hearsay objection because they failed to raise it at trial. The record reveals that counsel for codefendant Gomez did object to Cogar's testimony about Diamond's statements, but only on the grounds that the statements

---

**11.** *Geaney* permits admission of hearsay, "subject to connection," prior to the independent evidence. *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); *see United States v. Harris,* 542 F.2d 1283, 1300 (7th Cir. 1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977) (order of proof is in trial court's discretion). Under *Geaney,* the coconspirator's declarations are treated as hearsay. The Federal Rules of Evidence, however, provide that extrajudicial declarations of a coconspirator made during the course and in furtherance of a conspiracy are not hearsay and are admissible against all conspirators. Fed.R.Evid. 801(d)(2)(E); *see United States v. Ortiz,* 553 F.2d 782, 783–84 (2d Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 183 (1977); Note, *The United States Courts of Appeals: 1976–1977 Term Criminal Law and Procedure,* 66 Geo.L.J. 201, 590–91 & n.2191 (1977).

**12.** The rationale of the coconspirator exception to the hearsay rule is that coconspirators, as partners in crime, have authorized each other to make statements in furtherance of the conspiracy. Consistent with this rationale, *Glasser* limits the exception by requiring independent nonhearsay proof of the existence of the conspiracy. *Glasser* specifically mentions only the need to prove, in this manner, the participation of the *defendant* against whom the declaration is offered; the facts of that case provided meagre proof of such participation. But we do not believe that *Glasser's* concern about bootstrapping was limited to that situation. It is just as unfair to allow hearsay to justify its own admission where, as here, there is ample

proof that the defendants against whom it is admitted (the DeFillipos) participated with others in a conspiracy but thin or questionable proof that the *declarant* was a coconspirator. Other cases and authorities, without discussing this distinction, have assumed that a conspiracy between the *declarant* and the defendant must be independently shown. *See United States v. Doulin,* 538 F.2d 466, 471 (2d Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178 (1976); *United States v. Ragland,* 375 F.2d 471, 477 (2d Cir. 1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968); C. McCormick, *Handbook of the Law of Evidence* § 267, at 645 n.26 (E. Cleary ed. 1972); *Developments in the Law—Criminal Conspiracy,* 72 Harv.L.Rev. 920, 987 (1959). One case in this circuit, *United States v. Gerry,* 515 F.2d 130, 141 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), recognizes the issue but finds no need to resolve it.

**13.** It is possible to argue that Diamond's statements qualify for admission as "verbal acts," offered not to prove the truth of the matter asserted but to show his and Santa's involvement in the conspiracy. *See United States v. Stanchich,* 550 F.2d 1294, 1297–98 & n.1 (2d Cir. 1977); *United States v. D'Amato,* 493 F.2d 359, 363–64 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974); *see also United States v. Hassell,* 547 F.2d 1048, 1052–53 (8th Cir.), *cert. denied,* 430 U.S. 919, 97 S.Ct. 1338, 51 L.Ed.2d 599 (1977) (declarant's statements to undercover agent that defendant had previously purchased heroin for others and that his money would be returned are admissible as verbal acts).

were not in furtherance of the conspiracy and that they occurred after the conspiracy had ended. At no time did any of the counsel for the six codefendants object that Diamond's participation in the conspiracy had not been shown by independent non-hearsay evidence. We do not believe that the trial judge's admission of Diamond's statements was plain error under Fed.R. Crim.P. 52(b).

## III. DENIAL OF THE MOTION TO SUPPRESS

█ Appellants argue that the trial judge improperly denied their motion to suppress the Schick shaving products seized from the CBS warehouse on March 13, 1975. They contend that the affidavit underlying the search warrant was insufficient and that, by virtue of the possession charge and their "interest" in the seized goods, they had standing to contest the resulting search. The argument that the affidavit was insufficient is precisely the argument that the appellants in *United States v. Kahan, supra,* unsuccessfully advanced. We wholly agree with that court's reasoning and conclusions, 572 F.2d at 929–32; in our view it would serve no useful purpose to repeat them. Because we dispose of the issue on the merits, we need not discuss the standing issue which the district court also found barred appellants' claim.

## IV. JOINT REPRESENTATION

Appellant Patrick DeFillipo argues that the district court erred in permitting a single attorney to represent both himself and his brother James at trial. He points out that the Government's principal witness, Pollari, had a longstanding relationship with James but not with Patrick: Pollari and James had been roommates and were

close friends, and James was the godfather of Pollari's child. Moreover, James had made crucial incriminating statements to Pollari, particularly the one advising him before the hijacking occurred that there would be "work" the next day. Patrick argues that an attorney representing only Patrick could have "drawn on James's closeness to Pollari for an exculpatory argument for Patrick" and could have urged that Patrick aided in the unloading simply to help his brother without necessarily knowing that the goods were stolen.

We reject this argument, although not without some difficulty; for the members of this panel have expressed their disapproval of the practice of joint representation at trial in *Kaplan v. Bombard,* 573 F.2d 708, 715–16 (2d Cir. 1978) (Mansfield, J., concurring), *United States v. Carrigan,* 543 F.2d 1053, 1057–58 (2d Cir. 1976) (Lumbard, J., concurring), and *United States v. Mari,* 526 F.2d 117, 119–21 (2d Cir. 1975) (Oakes, J., concurring), *cert. denied,* 429 U.S. 941, 97 S.Ct. 359, 50 L.Ed.2d 311 (1976). But the fact remains that a defendant, to establish that he was denied the effective assistance of counsel, must show some *specific* instance of prejudice resulting from a joint representation. *Salomon v. LaVallee,* 575 F.2d 1051, 1054 (2d Cir. 1978); *Kaplan v. Bombard, supra,* 573 F.2d at 712; *United States v. Carrigan, supra,* 543 F.2d at 1055.[14] If the trial judge has conducted a careful inquiry into the dangers of joint representation and the defendants nevertheless proceed with a single attorney, they bear the burden of showing that prejudice resulted. *Salomon v. LaVallee, supra,* 575 F.2d at 1055.

Here, Chief Judge Mishler very carefully advised Patrick and James of the potential dangers of joint representation.[15] The

---

**14.** *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), to which appellant Patrick refers, is not applicable to this case. In *Holloway,* the Court found a Sixth Amendment violation where an attorney representing multiple defendants actually called the trial court's attention to a perceived conflict, but the judge did not permit him to withdraw. The Court reserved judgment on the standard governing

our situation in which counsel did not raise a timely objection to joint representation. *Id.* at 483–84, 98 S.Ct. 1178.

**15.** The court told appellants at their arraignment that

[a] conflict of interest can arise in a variety of ways. It can arise from the very nature of the charge where one is in a different role

judge also went beyond this general warning and specifically advised the defendants to "explore very deeply to see if there is a conflict" and to review the issue with counsel to make sure that "he won't be representing one better than the other, and [that] the other won't be prejudiced because of the manner in which the defense will be carried out." This inquiry was more than sufficient to trigger the requirement that defendants prove specific prejudice. Patrick has clearly not made such a showing by his suggestion that independent counsel might have made something exculpatory out of the proximity of the relationship between James and the Government witness Pollari. Accordingly, we reject appellant's joint representation claim.[16]

We do not let this opportunity go by, however, without calling attention to the observations of Professor Geer in *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney*, 62 Minn.L.Rev. 119 (1978). As the professor points out, conflicts can arise that no one can anticipate, not only when defendants engage in plea bargaining or present inconsistent defenses, but also when a defendant takes the stand to testify. Here, for example, if Patrick had taken the witness stand the jury would inevitably wonder why James did not testify. The jury might infer not only that the defendant who remained silent had something to hide but also that the defendants' own lawyer found signifi-

cant differences between them. *See id.* at 130. Moreover, the prosecution's evidence in this case incriminated James somewhat more than Patrick; if, in testing the evidence, their joint attorney had emphasized that Pollari's testimony did not implicate Patrick (at least as to prior knowledge of the hijacking), the attorney would have implicitly highlighted the incriminating nature of the testimony as to James. *See id.* at 131. The attorney would face a similar conflict in closing argument. *See id.* at 132. Finally, jurors may harbor "the perhaps irrational notion of guilt by association" and may believe "that birds of a feather flock to the same lawyer." *Id.* at 136.

Constrained as we are to affirm, we nevertheless again emphasize the importance of avoiding potential abuse wherever possible by having separate counsel. Absent an en banc decision of this court, we cannot impose a per se rule to this effect through the exercise of our judicial supervisory power.[17]

## V. THE COURT'S CHARGE

■ A. Appellants object to the charge regarding guilty knowledge and recent possession of stolen property. They argue that the jury should not have been permitted to infer from appellants' possession of the goods appellants' knowledge that the goods were stolen because as hired hands they had only "technical" and not "real" possession and because there are too many other possi-

than the other. It can arise from the manner in which the defense is presented. Sometimes one fellow decides to take the blame and try to exculpate the other. Sometimes one will take the witness stand and the other will not. Sometimes the assumptions of the lawyer will be so framed it will be prejudicial to one, and often one cannot tell what the conflict[s] are until the trial is underway.

**16.** We need not pass on the Government's suggestion that based on *Kaplan v. Bombard*, 573 F.2d 708, 714–15 (2d Cir. 1978), appellant's consent to joint representation forecloses any objection on appeal.

**17.** An alternative to a self-imposed judicial rule has been suggested by one commentator: that

the American Bar Association might revise the Code of Professional Responsibility to prohibit counsel from representing multiple defendants in a criminal matter, on the grounds that the potential for a substantial conflict of interest that exists in every case of multiple representation justifies a blanket prohibition and that truly informed consent is likely to be rare and in any event is insufficient to outweigh the substantial public interest in representation untainted by conflict. *See* Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney*, 62 Minn.L.Rev. 119, 157–62 & n.152 (1978).

ble explanations of the origin of the stolen goods. But *Barnes v. United States*, 412 U.S. 837, 845, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973), clearly held that an inference of knowledge may be drawn from unexplained possession of recently stolen property. Judge Mishler's instruction, permitting but not requiring the jury to infer knowledge from the unexplained possession of the recently stolen Schick products, precisely followed the holding of the *Barnes* majority and the corresponding pattern instruction of E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 15.29 (3d ed. 1977).

B. Appellants also argue that the court's charge improperly foreclosed the impeachment of Government witnesses. The charge referred by example to a question that counsel for codefendant Santa asked Pollari on cross-examination. Counsel asked Pollari whether he ever stated during a party held by one Alan Sabelli that he, Pollari, was going to get even with Santa. Pollari denied making the statement. Counsel then asked Pollari whether he ever told Sabelli that he had used heroin while in the service, and Pollari denied that as well. Santa's counsel did not call Sabelli to the stand. In Judge Mishler's final charge, he instructed that the jury may not presume the truthfulness of what the lawyer as-

sumes in a question unless the assumption is supported in the record.[18]

■ Appellants rely upon *Dyer v. McDougall*, 201 F.2d 265, 269 (2d Cir. 1952), to argue that a trial judge must permit the jury to draw a negative inference from disbelieved testimony. Appellants appear to concede that *Dyer* forbids such negative inferences when there is no other evidence of the fact that the negative inference suggests but urge that this rule should apply only where the party urging the inference bears the burden of proof. Here, unlike the situation in *Dyer*, appellants do not bear that burden.[19]

■ We need not, however, resolve the scope of *Dyer*, for the principles of that case are not directly relevant here. The issue before us is not whether the court should permit the jury to disbelieve a witness's statements when there is no other evidence in the record counseling disbelief; the issue is whether the court should, absent other evidence, permit a jury to believe the assumed facts underlying a lawyer's question when the witness answers the question in the negative. In a case like ours, an instruction that the jury should not accept the assumed fact as true absent independent proof simply adheres to the traditional evidentiary rule that "a question [which

---

18. The court charged:

At times, the lawyer on cross-examination, incorporated a statement, assuming a certain fact to be so, and asked the witness whether it was so. Well, if it is not otherwise supported in the record, you may not consider that fact as true. For example, in one of the questions, one of the lawyers asked the witness whether it was not true that he had told Mr. Sabillius, or a name something like that, that he would get even with one of the defendants. The witness said, no, he never said that. Well, cross-examination is a tool for revealing the truth and the tools that are used are designed to do it, but do not necessarily perform the task with every question. As I say, it was a proper question, but once the witness said, no, it didn't happen, never said it, you may not assume the contrary unless there is evidence in the record otherwise, outside that question, that supports the assumed fact.

19. As this court said in *United States v. Marchand*, 564 F.2d 983, 986 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978), although *Dyer v. McDougall*, 201 F.2d 265 (2d Cir. 1952), permits a jury to assume the truth of what a witness denies, on the basis of his demeanor, "a court cannot allow a civil action, much less a criminal prosecution, to go to the jury on the basis of this alone." Thus, the *Dyer* rationale need not imply a prohibition against a jury's disbelieving the testimony of witnesses for the party with the burden of proof, including the Government in a criminal case; for the other party (or criminal defendant) is relying on that disbelief to establish the insufficiency of the proponent's case. *See United States v. Jenkins*, 510 F.2d 495, 499 (2d Cir. 1975); *see also In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

**1240**

assumes a fact] may become improper on cross-examination, because it may by implication put into the mouth of an unwilling witness, a statement which he never intended to make, and thus incorrectly attribute to him testimony which is not his."[20] This rule does not foreclose the jury from considering the credibility of a witness, for the jury may still evaluate the truthfulness of the witness's *answer* to the question.[21] Rather, consistent with the rationale of preventing lawyers from distorting the evidence, the rule only precludes the jury from presuming, without further proof, the truth of the facts assumed in the question. We therefore hold that the court's charge in this respect was not erroneous.

## VI. THE "SIMILAR ACT" EVIDENCE

 Appellants allege that they were deprived of a fair trial by the introduction in evidence of their prior New Jersey convictions for the possession of the stolen Yves St. Laurent suits. "Other crimes" evidence is not admissible to show that the defendant had a bad character or a proclivity to commit certain crimes and that he acted accordingly in the case on trial. The evidence may be admitted, however, where it is relevant to an *actual issue in the case* with respect to "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," Fed. R.Evid. 404(b); *see United States v. O'Connor*, 580 F.2d 38 (2d Cir. 1978), provided that its probative value outweighs its potential unfair prejudice to the defendant. Fed.R.Evid. 403; *United States v. O'Connor, supra.* There is of course no presumption that the evidence is relevant. *United States v. O'Connor, supra.* Quite plainly the DeFillipos' possession of a large quantity of goods stolen from interstate commerce in December, 1974, was highly probative of their knowledge and intent when they possessed the stolen Schick products three

months later in March, 1975. Knowledge and intent were very clearly in issue; indeed, they were the only issues because the defense was that the DeFillipos were simply hired hands who loaded and unloaded the goods without knowing that they were stolen. The evidence as to the Yves St. Laurent suits tended to negate this defense of mistake or lack of knowledge. We cannot say that the significant probative value of this evidence was "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. As the Government suggests, this case involves a classic use of similar act evidence. We hold that admission was clearly proper.

Judgment affirmed.

LUMBARD, Circuit Judge, with whom MANSFIELD, Circuit Judge, concurs, concurring:

I concur in the affirmance of the convictions.

 The defendants and their counsel were fully advised prior to trial by Chief Judge Mishler regarding the dangers of possible conflicts of interests which might arise from their being represented by the same counsel. Despite this advice they elected to proceed with the same counsel. Judge Mishler then permitted the defendants to stand trial with the same counsel. I think that should end the matter and they should not now be heard to complain.

If we are to inquire into claims of prejudice in every case where co-defendants have been convicted after trial during which two or more of them were represented by the same counsel, despite full warning by the court of the dangers of such representation, we are inviting the creation of strategies and situations during the course of trial which may lend color to claims of prejudice from conflicts of interest when the convictions are on appeal.

---

**20.** 3 Wigmore, *Evidence* § 780, at 171 (Chadbourn rev. 1970) (emphasis omitted).

**21.** We note that the court did give a clear general instruction explaining that the jury was

The Judicial Conference of the United States in September, 1978, approved a proposal of the Advisory Committee on Criminal Rules to amend Rule 44, which deals with the right to and assignment of counsel.[1] Proposed Rule 44(c) would require the court, after defendants have been charged, promptly to inquire with respect to joint representation and personally to advise each defendant of his right to separate representation. The proposed amendment further provides:

> ". . . Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel."

 Meanwhile, trial judges can save themselves difficult questions at trial and at the retrial of cases if they will adopt a firm line in requiring separate counsel. Many of them are already doing this. Indeed, separate counsel should be required as soon as possible after formal charges have been filed as serious conflicts of interests can and do occur with respect to pre-trial strategy and pleas of guilty. Where the need for separate counsel imposes any undue financial burden the district court can appoint counsel under the Criminal Justice Act, 18 U.S.C. § 3006.

---

the sole judge of the credibility of the witnesses.

1. This proposed rule does not become effective until it has been sent to the Congress by the

Supreme Court of the United States and the Congress has failed to act thereon for a period of 90 days. 18 U.S.C. § 3771.