**UNITED STATES of America ex rel. Billy McCALL, Petitioner,**

v.

**James E. O'GRADY and Neil F. Hartigan, Respondents.**

**No. 89 C 1964.**

United States District Court, N.D. Illinois, E.D.

June 6, 1989.

---

Frederick F. Cohn, Chicago, Ill., for petitioner.

Richard Landon, Atty. Gen. of Illinois, Crim. Appeals Div., Chicago, Ill., for respondents.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Petitioner Billy McCall, an inmate at the Vandalia Correctional Center, seeks habeas relief pursuant to 28 U.S.C. § 2254 from his conviction for residential burglary and possession of a stolen motor vehicle and sentence of five years imprisonment.[1] For the reasons stated herein, the petition is granted.

1. Petitioner and respondent have represented that Billy McCall was not incarcerated to serve this sentence until April 10, 1989. Since he was not in custody at the time he filed this petition, he properly named Neil F. Hartigan, Attorney General of the State of Illinois, and James E.

## Factual Background[2]

On January 9, 1986, Chicago police officer Eugene Shephard's residence at 857 West 129th Place in Chicago was burglarized. In addition to stealing various items from the Shephard home, the burglars drove off with a 1983 Chevrolet van, license plate # 58002 RV, which had been parked in the garage. At the time of the burglary, Keenan Lett, a next-door neighbor, was talking to some friends in another neighbor's driveway four houses down the street. Lett saw the van leave the Shephard residence and travel down the street. The van passed Lett and his friends, coming at one point within twenty feet. One of Lett's friends waived to the driver of the van, and the driver waved back. Lett also noticed a brown Mercury Monarch parked near the Shephard residence.

The day after the burglary, two police officers came to Lett's home for an interview. Lett did not recall at trial the names of those officers and denied on cross-examination that he ever told them that he did not see and probably would not be able to identify those individuals who were driving the van and the Monarch. However, in a police report dated January 10, Officers Robert Tetti and G. Valleyfield stated that Lett said in the interview that he had "seen offenders [sic] car and victim [sic] van leave area but did not get a good look at offenders." In a later police report filed on January 30, Detective B. Campbell stated that Lett told Shephard that he "observed two unknown M/Blks get into a 1974 or 76 Mercury Monarch gray in color and drive away from victims home [sic] along with the victims 1983 Chevrolet van [sic], brown & beige in color, Lic # 58002RV, Il 1985. Witness stated that he did not get a good look at offenders and probably couldn't identify them."

Detective William Stark, assigned to investigate property crimes in another area of the city, was notified to keep an eye out

O'Grady, Cook County Sheriff, as respondents. Rule 2(b) of the Rules Governing Section 2254 Cases.

2. The following facts are distilled from the trial record and the state appellate court summaries.

for a 1983 or 1984 brown and beige van with possible license plate numbers XRU 130 or VRU 130.[3] On February 4, he noticed a brown van with license plates RXU 130 traveling on 83rd street. He followed the van, drove by its right side and caught a glimpse of the driver. Instead of pulling the van over, he returned to the station and learned through a computer check that the plates belonged to Billy McCall. On February 11, Stark again encountered the van and followed it. This time he decided to pull it over and gave chase. The van eventually turned into a dead-end street, and two occupants jumped out and fled. The van was in fact Shephard's, and Stark later identified Joe McCall, Billy's brother, as the driver in both instances. An investigation revealed only Joe McCall's fingerprints in the van and that the steering column had been peeled—i.e., someone had torn off the plastic cover on the column in order to access the steering mechanism. As of the trial, the only other stolen item recovered was a .357 Smith & Wesson revolver. No evidence linked the revolver to either McCall brother.

On February 12, Stark went to the residence of Billy and Joe McCall's mother. Neither Billy nor Joe were home. Stark left a business card and asked that Billy get in touch with him. Stark then proceeded to Lett's home. Lett identified Billy from a set of six photographs as the driver of the van on the day of the burglary. Two days later, Stark arrested Billy and Joe. In a lineup, Lett again identified Billy. The record does not indicate whether Joe was in either the photographic array or the lineup.

The state filed charges against Joe and Billy. Diane Shelley represented both defendants throughout the pre-trial investigation and proceedings. On the day of trial, the state dropped charges against Joe and proceeded only against Billy. The state's witnesses included Shephard, Lett and Stark. Shelley unsuccessfully tried to get Lett to admit that he had told police officers the day after the crime that he did not

get a good look at the offenders and could not identify them. The court struck all of that line of questioning and testimony because Shelley based it on Detective Campbell's January 30 police report which constituted double hearsay—Lett told the victim who told the Detective. She did not pursue the questioning on the basis of Officer Tetti's January 10 report which did not suffer from that evidentiary shortcoming. Consequently, all that Shelley was able to establish in her cross-examination of Lett was that the person driving the van was wearing a tan wool hat and that he waved at Lett and his friends as he drove by.

Billy presented an alibi defense. James Coleman, his alleged employer for approximately three years, testified that Billy worked for him most of the month of January and probably was working on January 9, the day of the burglary. He further testified that when he was picking Billy up on the morning of January 11, he noticed that the rear license plate on Billy's car was missing and warned Billy to put on his plate since the city had posted street cleaning signs. Billy took the stand and testified that he was working on January 9 but could not recall specifically which other days during that month he had worked. He also stated that his car had been nonoperational since December 1985, and he reported the missing plate on January 11. The police report did not identify any plate number, but Billy insisted he gave the police officers that number. On rebuttal, the state called Levon Johnson, a foreman in the Department of Sanitation, who testified that while streets are sometimes cleaned in January, no signs were posted on January 11.

In closing, the state relied primarily on the apparently unbiased testimony of Lett and that Billy's plate was found on the van. The state also challenged Billy and Coleman's veracity, noting their selective memory. Shelley in her closing restated Coleman's testimony and pointed out that Billy reported his missing plate. She then at-

---

**3.** It is not clear from the record how the police knew at that point that Shephard's license plates

were replaced with plates with these numbers.

tempted to pin responsibility for the crime on Joe, emphasizing that Joe, not Billy, was found driving the van on two separate occasions and that only Joe's fingerprints were found in the van.[4] She was unable to challenge Lett's ID testimony in any way, except to point out how unusual it was for a burglar to wave to witnesses. The state, relying only on the fact that the police report did not identify a plate number and despite Billy's testimony to the contrary, explained on rebuttal that Billy did not tell the police his plate number because they would have pulled the van over.[5]

The jury convicted Billy of residential burglary and possession of a stolen motor vehicle. In a post-trial motion, Billy argued the ineffective assistance of counsel on two grounds pertinent here: Shelley was incompetent in failing to properly impeach Lett with the Tetti report and, if necessary, Tetti's testimony; and Shelley operated under a conflict when she represented Billy and Joe prior to the trial. The trial court denied the motion, and Billy appealed. On August 9, 1988, the appellate court upheld the conviction. *People v. Billy McCall*, No. 1-87-0789 (1st Dist. Aug. 9, 1988). Without determining whether Shelley's failure to effectively impeach Lett was incompetent,[6] the court found that Billy was not prejudiced by the purported mistake since

> the totality of the evidence demonstrated strong circumstantial evidence of guilt. For example, defendant's license plates were affixed to the victim's van. Defendant remembered nothing specific about the dates he worked or did not work in January 1986 except for the fact that he worked on the day of the crime and that it was a Thursday. Coleman did not state that defendant worked on the day of the crime. Johnson impeached Coleman's testimony that he advised defendant to report the missing license plates

because of the prospect that the car would be towed by street cleaners. In our view, the jury would be entitled to infer that the testimony of defendant and Coleman was subject to doubt. Furthermore, because the police report lacked any license plate number it would have been reasonable for the jury to infer that, when defendant made the report, he deliberately withheld his license plate number because he had placed the plate on the stolen van.

*Id.*, slip op. at 5. The court also found that since there was no conflict at the time of trial, i.e., immediately after the state dropped charges against Joe, there was no actual conflict. Further, neither Shelley nor Billy ever raised at trial the possibility of a conflict. Finally, the court held that the trial court did not need to conduct a post-trial evidentiary hearing because the record resolved all claims. The Illinois Supreme Court denied leave to appeal. Having exhausted all available state court remedies in satisfaction of 28 U.S.C. § 2254(b), Billy filed this habeas petition raising the same claims raised on appeal.

## Discussion

### A. Conflict of Interest

■ There is always a possibility that an attorney representing codefendants will face a conflict of interest at some time before or during trial. In the worst-case scenario, the attorney may find that the best defense for one of her clients is to pin responsibility on the other. The Supreme Court has nevertheless made it clear that this possibility does not render joint representations a *per se* violation of the Sixth Amendment right to counsel. *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978). When the government or a defendant alerts the court to a potential conflict in a particular crimi-

---

**4.** Shelley stated: "Maybe, it was Joe. Maybe, it was Joe who burglarized the home, but we know it was not Billy in that van," R. 179; "Do you have any doubt that it was Billy? Maybe, it was Joe," R. 181.

**5.** Under this line of reasoning, Billy apparently did not consider that the police might be able to

find the plate number by entering Billy's name and address, both indicated on the police report, into the computer system.

**6.** The court did note that under Illinois law an attorney's decision to refrain from impeaching a witness cannot be challenged.

nal proceeding, or the "possibility of a conflict of interest [is] sufficiently apparent at the time," *Wood v. Georgia,* 450 U.S. 261, 272, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981), the court must address the issue to ensure that the joint representation may continue without running afoul of the Sixth Amendment rights to a fair trial and the effective assistance of counsel. *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 1698, 100 L.Ed.2d 140 (1988). When, however, a defendant first raises the specter of a conflict on appeal or in a collateral challenge, the defendant must demonstrate that counsel's performance was adversely affected by an *actual* conflict. *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); *United States v. Sutton,* 794 F.2d 1415, 1420 (9th Cir. 1986).

■ Neither the government nor Billy McCall alerted the trial court to the possibility that Shelley operated under a conflict of interest until after trial, and the trial court was reasonable in believing that any conflict was avoided when the state dropped charges against Joe McCall[7] and Shelley represented only Billy at trial. To prevail then, Billy must point to specific instances in the record that evidence an actual conflict that adversely affected Shelley's performance. *United States v. Cirrincione,* 780 F.2d 620, 629 (7th Cir.1985). He has failed to meet this burden.

Billy has not given us any reason to believe that Shelley's performance before or during trial was adversely affected by a conflict arising from her representation of the McCall brothers. The only alleged deficiency in performance to which Billy directs our attention was her failure to effectively impeach Lett with the January 10 report, a

failure that we cannot attribute to a conflict. All indications from the record suggest that Shelley was able to represent Billy zealously despite the pre-trial joint representation. She pursued the obvious defense that Joe, not Billy, was the guilty party. She effectively brought out all of the evidence that points in that direction— Joe was driving on the two occasions that Stark spotted the van; the police found Joe's, not Billy's, fingerprints in the van. Accordingly, Billy has not met his burden here and habeas relief on his claim of conflict-ridden counsel is denied.

### B. Failure to Grant an Evidentiary Hearing on the Conflict Claim

As here, Billy did not present evidence to the state trial court that could support his claim that Shelley's performance was unconstitutionally deficient as a result of the joint representation. Accordingly, the trial record fully resolved that claim, and the trial court was not remiss in denying the claim without an evidentiary hearing. *United States ex rel. Link v. Lane,* 811 F.2d 1166, 1172 n. 2 (7th Cir.1987), citing *Strickland v. Washington,* 466 U.S. 668, 700, 104 S.Ct. 2052, 2071, 80 L.Ed.2d 674 (1984).

### C. Attorney Incompetence

To prevail in an ineffective assistance of counsel claim, the defendant must show that counsel's performance fell "outside the wide range of professionally competent assistance" and that his defense was prejudiced by the error. *Strickland,* 466 U.S. at 687, 690, 104 S.Ct. at 2062, 2064. As to the former, we presume that counsel performed competently, and the defendant

---

7. We reject respondents' contention that the state's dropping charges against Joe by itself defeats Billy's claim that he was denied his right to conflict-free counsel. The right to counsel does not begin at trial. It applies to pre-trial proceedings and investigation as well. Courts have consistently recognized that the dangers that lurk in any joint representation can impact a defendant's case before as much as during trial. For example, an attorney operating under a conflict prior to trial may inadequately prepare a defense strategy or take a position in pre-trial negotiations with the prosecution that

serves one client at the expense of another. *United States v. Agosto,* 675 F.2d 965, 971 n. 5 (8th Cir.1982) ("The possibilities of conflict inherent in a case of multiple representation include: (1) in planning and executing trial strategy, the attorney may make decisions favoring one defendant over another ... (3) at the plea bargaining stage, the attorney's recommendation to each defendant might be affected by an assessment of the effect of the plea on the other defendant"); *United States v. DeFillipo,* 590 F.2d 1228, 1241 (2d Cir.), *cert. denied,* 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979).

must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*, 466 U.S. at 689, 104 S.Ct. at 2065, quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955). As to the prejudice component:

> It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.... The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.... When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

*Strickland,* 466 U.S. at 691–95, 104 S.Ct. at 2066–69.

■ The Illinois appellate court to the contrary notwithstanding, the failure to effectively impeach a state's witness may support an ineffective assistance claim. For example, in *Blackburn v. Foltz,* 828 F.2d 1177 (6th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988), the court faulted counsel's failure to impeach the state's identification witness with "the one obvious and only logical means of diminishing her identification testimony—procuring the transcript of [her] previous testimony in order to impeach her with prior inconsistent statements." *Id.* at 1184. *Compare Kubat v. Thieret,* 867 F.2d 351, 363–64 (7th Cir.1989) (failure to impeach a witness with reputation testimony was not unprofessional error since counsel effectively impeached the same witness with alternative methods); *Hans v. United States,* 646 F.Supp. 72, 73 (W.D.Pa.1986) (denying a claim of failure to adequately impeach a government witness when counsel did point out some, but not all, of the inconsistencies in the witness' testimony). Thus, while we recognize a presumption that defense counsel's failure to impeach a witness was competent trial strategy, that

presumption is not irrebutable as respondents and the state courts suggest.

■ Going one step further, the Seventh Circuit has found unconstitutionally deficient performance when defense counsel failed to present witnesses who might have cast serious doubt on the prosecution's main witnesses. In *Sullivan v. Fairman,* 819 F.2d 1382 (7th Cir.1987), the Seventh Circuit affirmed the granting of habeas relief on the ground that counsel failed to reasonably attempt to interview five apparently unbiased identification witnesses who made statements that were exculpatory and inconsistent with the testimony of the prosecution's witnesses on several essential matters. The Court found prejudice in that the defendant's only other defense, an alibi, was relatively weak. *Id.* at 1391–92. More recently, in *Montgomery v. Petersen,* 846 F.2d 407 (7th Cir.1988), the Court again affirmed the granting of a habeas petition on an ineffective counsel claim. There, the attorney did not call an unbiased witness who would have directly contradicted the prosecution's evidence and provided the defendant with an alibi defense. That the witness' testimony corroborated the testimony of twelve other defense witnesses did not render it merely cumulative for the twelve were family members or friends of the defendant:

> [T]he jury might well have viewed the otherwise impeachable testimony of the twelve [defense] witnesses in a different light had the jury also heard the testimony of this disinterested witness. Therefore, the [disinterested witness'] testimony may have transformed a weak case into a strong one merely by corroborating the testimony of these other defense witnesses.

*Id.* at 415. The gravamen of these decisions is that defense counsel has not represented the defendant to the satisfaction of the Sixth Amendment when counsel fails to pursue an impeaching cross-examination or present additional evidence that would in all reasonable probability cast a reasonable doubt on the testimony of the government's main identification witness.

We find that Shelley's failure to impeach Lett through the recorded statements in Officer Tetti's January 10 report deprived Billy of his right to the effective assistance of counsel. Shelley's lapse was contrary to a trial strategy that she expressly adopted. She attempted to impeach Lett with his prior inconsistent statement and was unsuccessful only because she gave up after the court would not permit her to use Detective Campbell's January 30 report for the impeachment. Respondents suggest that she did not rely on the January 10 report because it is unclear whether Lett meant he was unable to identify the person in the Monarch or the person in the van. However, respondents' suggestion is not compelling since Shelley tried to use the statement contained in the January 30 report which suffers from the same purported ambiguity. If the jury had been convinced that Lett did make that statement, it probably would have cast serious doubt on his testimony since at trial he expressly denied ever saying such a thing to the police. In sum, respondents have presented no rationale, and we can discern none, which explains Shelley's failure to perfect the impeachment of Lett with his prior inconsistent statement.

Shelley's error prejudiced Billy's defense since it deprived the jury of any reason to question the otherwise unassailable testimony of the state's only eyewitness. Had the jury disregarded or given insignificant weight to Lett's identification testimony,[8] there is a reasonable probability that the jury might have considered the evidence implicating Joe sufficiently strong to raise a reasonable doubt as to Billy's guilt. Unlike the Illinois appellate court, we do not view the circumstantial evidence against Billy as particularly strong. The jury could have easily inferred that Joe removed the license plate from Billy's nonoperational Pontiac and placed it on the van. Defense counsel might have rebutted the government's contention that Billy deliber-

ately withheld the license plate number when he reported the plate stolen with the argument that Billy, had he been the smart and sophisticated criminal that the government in closing painted him to be, would surely have considered that the police might have been able to trace the number from the Secretary of State's files through Billy's name and address. Finally, the apparent weakness in Billy's alibi defense only supports our finding of prejudice, for it elevated the importance of effectively impeaching Lett. *Compare Sullivan*, 819 F.2d at 1392. The combination of a strong challenge to the state's only direct evidence and a spirited presentation of the evidence against Joe might very well have given the jury sufficient reason to acquit Billy.

### Conclusion

Accordingly, Billy McCall's trial counsel's failure to effectively impeach the state's eyewitness fell below professional standards of competence and prejudiced Billy's defense. The petition for habeas relief on the ground of ineffective assistance of counsel is granted. The state is to retry Billy within 120 days or release him. It is so ordered.

---

8. To convince the jury to disregard this testimony, Shelley may have had to explain Lett's later identification of Billy in the photographic array and lineup. The record does not suggest any particular explanation, and we are reluctant to proffer any at this time, but it may very well have been that Shelley was prepared to do so had the jury been made aware of the prior inconsistent statement.