**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Glenn W. McMURRAY, R. Glade
Whiting, and Robert H. Wilstead,
Defendants-Appellants.**

Nos. 78–1928 to 78–1930.

United States Court of Appeals,
Tenth Circuit.

Argued Oct. 17, 1979.

Decided March 5, 1980.

William C. Hendricks, III, U. S. Dept. of Justice, Washington, D. C. (Ronald L. Rencher, U. S. Atty., Salt Lake City, Utah, and Stephen P. Learned, U. S. Dept. of Justice, Washington, D. C., on brief), for plaintiff-appellee.

F. Keith Biesinger, Salt Lake City, Utah, for defendant-appellant Glenn W. McMurray.

Michael A. Neider, Salt Lake City, Utah (Phil L. Hansen, Salt Lake City, Utah, on brief), for defendant-appellant R. Glade Whiting.

D. Gilbert Athay, Salt Lake City, Utah, for defendant-appellant Robert H. Wilstead.

Before DOYLE, BREITENSTEIN and McKAY, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

On February 8, 1977, in the United States District Court for the District of Utah, an indictment was returned against Glenn W. McMurray, R. Glade Whiting, Donn E. Cassity and Robert H. Wilstead. The indictment alleged that the Small Business Administration (SBA), an agency of the United States, required to administer the Small Business Investment Act of 1958 which codified a previous Act, 15 U.S.C. §§ 661–696, was defrauded by the defendants.

Appellants McMurray, Whiting and Wilstead were convicted following a trial (in August, 1978) to a jury, the Honorable William Juergens presiding. They were found guilty on one conspiracy count and additional substantive counts for making false entries in books and accounts. Counts V and VI were dismissed during the trial.

It is important to mention that McMurray and Whiting are described throughout the case, as far as the conspiracy is concerned, as "hub" defendants. On the other hand, Wilstead, for purposes of the conspiracy count, was a so-called "spoke" defendant. This appeal by McMurray and Whiting obtains to the contention that the conspiracy is barred by the Fifth Amendment doctrine of double jeopardy.

Wilstead, McMurray and Whiting assert various other errors with respect to the case which is here being reviewed, which case is No. Cr.–77–11 in the United States District Court for the District of Utah.

The Utah Capital Corporation (UCC) was a small business investment company (SBIC) licensed by the SBA pursuant to 15 U.S.C. § 681. Glenn W. McMurray, it was alleged in the indictment, was the president and chairman of the board of directors of Utah Capital Corporation; Donn E. Cassity was legal counsel, and R. Glade Whiting was the vice president and a director of Utah Capital Corporation.

The SBA sought to make available to small businesses private funds. At the same time, it sought to insure the private financial interest of the owners of small business investment companies such as UCC. To achieve the purposes, so it was further alleged, it guaranteed payments on debentures issued by SBICs subject to the restriction that the total amount of debentures guaranteed at any time from an SBIC was not to exceed 200 percent of the combined private paid-in capital and paid-in surplus of the company.

Following the grand jury investigation, four indictments were returned charging a total of 11 defendants. Three of these, McMurray, Whiting and Cassity, who have been referred to here as "hub" defendants, were charged in each of the four indictments. Wilstead and the other seven defendants, all of whom have been referred to as "spoke" participants in the conspiracy cases, were charged in one indictment each. The several indictments describe distinct transactions, conspiracies to defraud the government, and substantive offenses involving false entries in the books and records of the Utah Capital Corporation.

In each indictment, a group was charged with the making and receiving of distinct sham investments in UCC. The monies

were not retained by UCC, but were immediately returned to the contributing defendants in the form of sham loans to certain business entities. The sham investment money was used for the purpose of misleading the SBA as to the capital or the assets of the SBIC, Utah Capital Corporation, here referred to as UCC. In furtherance of the conspiracy, false entries were made in the books and records of UCC showing purported assets and facially legitimate loans.

As a result of the sham capitalization which is described in each of the indictments, UCC qualified for 200 percent of the amount of the capital increase in the form of government-guaranteed loans. Unbeknownst to the government, each of the "spoke" defendants—the "spoke" groups differed in each indictment—would be given accommodation loans as consideration for their participation in this scheme. In the case that we are now reviewing, the one-time defendant was, of course, Wilstead, and he received an accommodation loan for his services. It is to be noted that the defendants-appellants, McMurray and Whiting, were, as far as the four indictments are concerned, "hub" defendants in that they were the originators of the schemes, and took the initiative in pushing through the independent sham investments with the help of the "spoke" defendants.

The essence of the indictment in this case, as far as the "hub" defendants and principals were concerned, was conspiracy to increase UCC's paid-in capital and surplus, at least temporarily, in the amount of $725,-000. We are referring, of course, only to the transactions that are described in the indictment in this case. There were other similar transactions described in the other indictments. It was alleged in the indictment in this case that Wilstead provided, on a highly temporary basis, the sum of $725,-000, all of which was used to mislead the SBA.

The above descriptions have pertained for the most part to Utah case No. Cr.–77–11. However, a case involving a separate indictment was tried two months prior to the trial in Cr.–77–11. In Cr.–76–126, the allegations are quite similar to those that are found in the case at bar. The "hub" defendants and principals were charged with conspiracy to fictitiously increase UCC's paid-in capital and surplus in an amount different than that in the case at bar. The amount in that instance was $550,000. This amount was furnished by different "spoke" defendants. It is to be recalled that Wilstead was the sole provider in the case that is before us, whereas in Cr.–76–126, the $550,000 was provided by defendants Lindquist, Nemelka and Solomon. However, the money was reflected on UCC's books as an investment by Robert Solomon. The $550,000 became part of a larger $2,185,000 bank deposit on May 21, 1973, and a certified letter was presented to the SBA showing this deposit. Within a short time, however, the $550,000 was withdrawn. The funds in Cr.–76–126 were returned to Solomon and Lindquist through a series of bogus loans made to sham corporations which were controlled by Solomon, Lindquist, and Nemelka.

The same procedure was followed in the case at bar with the exception that Wilstead was the cooperating "spoke" defendant. His $725,000 was deposited and almost immediately withdrawn from UCC's control and returned to him through the use of sham loans to corporations controlled by him. Thereafter, Wilstead was compensated by receiving other payoff loans from UCC.

We have detailed, to some degree at least, the circumstances in these two cases because as far as the conspiracy in Count I is concerned, it is the position of the appellants McMurray and Whiting that their conviction on the conspiracy count was barred by their having been convicted of a conspiracy count in Cr.–76–126. They say that these transactions, although occurring at different times, were part of one large conspiracy.

What might be described as the Solomon, Nemelka and Lindquist transaction was perpetrated in May 1973. What might be described as the Wilstead transaction involved two applications, the one in May and the one in September. Wilstead furnished $200,000 which was reflected in the May

application to the SBA. In September, a second application was made, which is also described in the indictment in Cr.–77–11, in which there was a misrepresentation to the extent of $525,000, all of which was furnished by Wilstead. As a result of these two applications, there were guarantees issued by the SBA commensurate with the amount of money which was shown to have been present in the treasury of UCC in each instance.

The defendants McMurray and Whiting furnished the basic funds, and the defendant Wilstead furnished the enhancing funds. In May, for example, they were able to show a $2,185,000 bank deposit. This amount, along with the sham investment money, was contained in UCC's application for guaranty submitted on May 21, 1978. In connection with the May adventure, the enhancing money was, of course, removed. More money provided by Wilstead was deposited to cover the September application. This money was again withdrawn immediately. The government maintained that the May transaction and the September transaction were justifiably alleged in the indictment before us because Wilstead was the source of the sham funds in each instance.

In June 1978, Judge Winner presided over case No. Cr.–76–126, also a Utah case, and it was at that time that, upon the government's motion, the court dismissed all counts of the indictment except the count of conspiracy. The jury returned verdicts of acquittal as to Cassity and guilt as to McMurray and Whiting of the conspiracy, and it is this judgment which is said to constitute a bar to prosecution of the conspiracy which we are reviewing, that is, Cr.–77–11.

This case went to trial in August 1978, before Judge Juergens. The defendants were found guilty of conspiracy, and McMurray, Whiting and Wilstead were convicted in Counts II, III, IV and VII, the substantive counts.

## CONTENTIONS ON APPEAL

The points that are advanced by the defendants in this appeal are:

*First*, on behalf of McMurray and Whiting, that the allegations in the several indictments are substantially identical and should have been included in a single conspiracy charge. They maintain that there was only one agreement and one objective, which could not lend itself to two distinct indictments and two convictions.

*Second*, it is contended that the court erred in allowing the substantive counts to go to the jury; that it should have granted judgments of acquittal. The basis for their arguments on this is that the evidence is legally insufficient to justify the submission of these counts to the jury.

*Third*, that the trial court erred in admitting hearsay evidence. This is more or less a question of timing. The point which is made is that the trial court received the evidence after finding that a prima facie case of conspiracy had been proven, but it did not "determine" that a conspiracy existed.

*Fourth*, it is maintained that the court erred by denying appellants' requested Instruction No. 4 concerning character evidence and improperly instructing the jury on this subject.

*Fifth*, that the court erred in denying appellants' requested Instruction No. 5 pertaining to reliance on counsel relative to willfulness and intent. Objection is made, in addition, to the instruction which the court gave on the issue of willfulness.

I.

WAS THE CONSPIRACY COUNT IN THE CASE BEFORE US IN LAW A PART OF ONE SINGLE COMPREHENSIVE CONSPIRACY WHICH EMBRACED Cr.–76–126 WHEREIN McMURRAY AND WHITING WERE PREVIOUSLY FOUND GUILTY, WHEREBY THEY ARE PROTECTED FROM THE INSTANT PROSECUTION BY THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT?

The defendants contend that the transaction which here went to trial and which is

referred to as the Cr.–77–11 indictment is simply a repeat of the other transaction which involved different secondary parties. Wilstead was what might be called a secondary party in this case. He was the one, in other words, who supplied money to deposit in the bank account which was used to mislead the government. The secondary parties in the Cr.–76–126 indictment were Kenneth R. Lindquist, David T. Nemelka and Robert Solomon. As has been previously mentioned, these transactions took place on different dates. They involved different subject matter, that is, the obtaining of a loan guaranty from the SBA in addition to that which had been obtained in the Cr.–76–126 case involving the three individuals just mentioned. There was different, temporary capital furnished by a different party for bringing about the fraud.

It is to be emphasized as well that the contention here is unusual. It is seldom that objection is made to a failure to join all of the different transactions in one conspiracy indictment. Usually the objection is to the joinder. Yet, that is the position of the defendants here. They say that they are prejudiced by the fact that the government did not join the several transactions in one conspiracy. The point that they raise, however, is not one which is related to or is incident to the failure to join of itself. It is the contention of defendants that this present conspiracy prosecution was barred by the former jeopardy doctrine due to the conspiracy judgment in the Cr.–76–126 prosecution. The position of the government is that the fact that the same parties are charged with being members of two conspiracies,[1] and the fact that both conspiracies concerned transactions having a similar pattern and overlapped somewhat in terms of capital employed in the fraud, does not establish that the two conspiracies are in fact and in law but one for double jeopardy purposes. *See United States v. Martinez,* 562 F.2d 633 (10th Cir. 1977). In *Martinez,* various parties conspired with one common group of coconspirators. The evidence in the *Martinez* case established that there were distinct or separate transactions and no one combination embraced the objectives and purposes of the others. In the case at bar there was no one identifiable objective, and this alone would mark this case as having separate and distinct transactions. *See, United States v. Martinez, supra; United States v. Butler,* 494 F.2d 1246, 1255 (10th Cir. 1974); *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1945).

█ The cases thus recognize that the scope or breadth of an agreement to do unlawful acts is the determining factor as to the scope of the conspiracy. This is largely a question of the facts of each case. If the facts reveal an agreement to carry out an illegal plan or goal, a single conspiracy exists. To be a single plan, however, there must be interdependence between the participants and knowledge of the scope of the scheme or plan on the part of the participants. Neither of these elements are present here.

██ It is not uncommon for conspiracies to be complicated and to have numerous individuals participating in separate phases or steps of the total scheme, and this does not prevent it from being a single conspiracy. *See United States v. Cervantes,* 466 F.2d 736, 738 (7th Cir. 1972). However, there must be facts which bring the alleged conspirators into a single agreement to achieve the same objective if it is to qualify as a single unlawful combination of defendants.

It might be said parenthetically that if the transactions in this case had been treated as a single conspiracy, then there is reason to believe that the defendants in this case would be objecting to its duplicitous character and would have been claiming prejudice stemming from their having been included in a complicated and many-faceted scheme of great magnitude.

1. Although in this instance the parties who furnished the money for the purpose of the deception of the SBA are different.

The most pertinent and helpful decision is that of the United States Supreme Court in *Kotteakos v. United States, supra.* The facts in that case are similar to the facts of this case although the problem was different. There the question was whether the petitioners had suffered substantial prejudice from having been convicted of a single general conspiracy by evidence which defendants contended proved not one conspiracy but several of the same type executed through a common figure. One Brown was the central figure in a scheme to induce various financial institutions to grant credit with the intent that the loans or advances would then be offered to the Federal Housing Administration for insurance on the applications. The applications contained false and fraudulent information. Brown had acted as a broker for others in placing the loans and had charged five percent commission for his services. He obtained the loans for several persons and for groups of persons, all of whom were named in the original conspiracy indictment. The important thing was that there was no connection shown between the defendants other than Brown, who received loans from the latter, and the particular petitioners in the case. The only thing in common was that Brown had been the instrument in each instance for obtaining the loans. The Court said:

> In many cases the other defendants did not have any relationship with one another, other than Brown's connection with each transaction. As the Circuit Court of Appeals said, there were "at least eight, and perhaps more, separate and independent groups, none of which had any connection with any other, though all dealt independently with Brown as their agent." . . . As the government puts it, the pattern was "that of separate spokes meeting in a common center," though, we may add, without the rim of the wheel to enclose the spokes.

328 U.S. at 754–755, 66 S.Ct. at 1243.

The Court went on to state:

> The trial court was of the view that one conspiracy was made out by showing that each defendant was linked to Brown in

one or more transactions, and that it was possible on the evidence for the jury to conclude that all were in a common adventure because of this fact and the similarity of purpose presented in the various applications for loans.

> This view, specifically embodied throughout the instructions, obviously confuses the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character.

328 U.S. at 768, 66 S.Ct. at 1249.

The Court ruled that the petitioners had suffered substantial prejudice as a result of having been convicted of a single general conspiracy on evidence which the government acknowledged proved not one conspiracy but some eight or more unrelated ones. The holding was regarded as necessary to protect each defendant's right to have guilt determined on an individual basis and to avoid the dangers of transference of guilt from one defendant to another.

In *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), the holding was that the evidence was sufficient to show that the five defendants there were properly joined in a single conspiracy to sell whiskey at prices which exceeded the ceilings set by the government. Although the sales were black market, they were purported to be legal. Each of the defendants had some part in arranging sales and deliveries of portions of two larger shipments of liquor to purchasers. The purchasers were tavernkeepers. The defendants were intermediaries between the owner of the liquor and the tavernkeeper. The defendants argued that there was more than one conspiracy.

The fact which the Supreme Court considered important was that all five defendants had joined in the effort to sell whiskey at over ceiling prices in the guise of legal sales. The Court also thought that the two agreements involved were merely steps in the formation of the larger and ultimate general scheme. In other words, both

agreements were aimed at the same illegal objective.[2]

We have quoted the *Blumenthal* language to show the means that the Court used to distinguish the *Kotteakos* case, where it was thought that the number of agreements was important. In *Kotteakos*, none of these evidenced interdependence in the formulation of an all-inclusive conspiracy designed to achieve a single, unlawful end. On the contrary, each separate agreement had its own distinct illegal end. We say that our case has the same qualities. Thus, there are four distinct indictments which describe four identifiable efforts to cheat the government of different amounts of money on different occasions. So, the guidelines that are set forth in *Blumenthal* serve to distinguish this case as well as the *Kotteakos* case. It is said that there was no drawing altogether into a single comprehensive plan in *Kotteakos*; that no conspirators were interested in whether any loan other than his own went through, whereas in *Blumenthal* it was said that all knew of and planned in the overriding scheme. All sought to aid the owner to sell the whiskey unlawfully.

So, the factor which emerges as being consequential is that there shall have been a single objective which flowed from the several conspiracies together with interdependence of the coconspirators in realizing an ultimate objective. Here we have neither a single objective nor is there a cooperative effort in which all are involved. In our case there is a notable lack of evidence that the defendants who were charged with putting up the money which did the misleading had knowledge that there were other similar transactions in which the money of other people was used. The several transactions were conducted independently, and the success or failure of each objective was not dependent on the ·fate of the others. Thus, we are brought back to the close similarity of the present case to *Kotteakos*.

The same evidence test does not have as much approval as it had at one time. *See United States v. Papa*, 533 F.2d 815 (2d Cir.), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976), wherein a claim of double jeopardy was asserted where the defendant had been convicted on a charge of conspiring to traffic in narcotics. He claimed that the conviction was barred be-

**2.** The Court stated:

> The scheme was in fact the same scheme; the salesmen knew or must have known that others unknown to them were sharing in so large a project; .... By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal.
>
> The case therefore is very different from the facts admitted to exist in the *Kotteakos* case. Apart from the much larger number of agreements there involved, no two of those agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from others, although all were alike in having similar illegal objects. Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, overall, comprehensive plan.
>
> Here the contrary is true. All knew of and joined in the overriding scheme. All intended to aid the owner, whether Francisco or another, to sell the whiskey unlawfully, though the two groups of defendants differed on the proof in knowledge and belief concerning the owner's identity. All by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in disposing of the whiskey. True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus that he was aiding in a larger plan. . . .
>
> We think therefore that in every practical sense the unique facts of this case reveal a single conspiracy of which the several agreements were essential and integral steps . . . .

*Id.* at 558, 68 S.Ct. at 257.

cause of a previous conviction on a guilty plea to another indictment involving conspiracy to traffic in narcotics. The court found that the defendant was the director of two unrelated chains distributing narcotics, and the fact that he supervised each of them did not render the acts one single conspiracy.

See also United States v. DeFillipo, 590 F.2d 1228 (2d Cir.), cert. denied, 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979). The Court in this latter case held that the important determining factor in the present context is whether or not there is a relationship between the two transactions. The Court held that they were independent agreements rather than one continuing conspiracy.

*　　*　　*　　*　　*　　*

From the authorities we conclude that there is not any single reliable test which resolves this jeopardy problem. Certainly the same evidence test which is a simple one and which is the traditional common law approach is not considered reliable.

There does not seem to be any escape therefore from giving careful scrutiny to the facts in the light of the particular conspiracy offense and the guidelines which are usually looked to.

■ Where in the unlawful agreement there exists common knowledge and some interdependent relationship between the agreements which serve to tie the agreements and the parties together and which lead to one conspiratorial object, it is a single indivisible conspiracy.

In the case at bar, apart from the possibility that the primary conspirators had but a single object, that of getting as much money from the SBA as possible, as distinguished from the secondary or so-called "spoke" conspirators, the secondary conspirators who furnished the temporary money were concerned with only one subject objective. Finally, the several transactions were not dependent on each other, nor in the case of the defendants who provided the temporary capital was there knowledge of the involvement of the others.

Use of an analogy involving another offense helps to clarify the individuality of the several acts here. Could it be argued that conspiracies by some different and some of the same defendants to perpetrate aggravated robberies against the same bank on different dates would always constitute a single conspiracy? True, such activities could very well seek to follow the same pattern, but surely they have an independent character which justifies the charging of individual crimes. Certainly the several overt acts would not necessarily be a link to one conspiracy.

As a practical matter, the determination that the first conspiracy did not bar the one in this case has little effect on the convictions in this case, because all of the sentences were to run concurrently for the convictions on conspiracy Count I and the several substantive offenses. Thus, defendants were found guilty on Counts I, II, III, IV and VII. A favorable judgment on Count I would not have any effect on Counts II, III, IV and VII so that the defendants would serve substantially the same, if not identically the same, sentence.

■ Finally, there is no evidence whatsoever that the government acted with any bad faith motives. The indictments were drawn with reference to the time of the execution of the individual conspiracies. One case has noted that the problem of whether to indict by way of a single conspiracy or separate ones is a delicate one. See United States v. Ingman, 541 F.2d 1329, 1331 (9th Cir. 1976). The prosecutor must carefully weigh the problems and the legal arguments that are likely to arise. Regardless of how it is resolved, there is certain to be difficulty. The approach which minimizes the difficulties and the prejudice will be the preferred solution. Here the facts lent themselves to treating the transactions separately. The conspiracy here was not barred by the conviction in Cr.–76–126.

## II.

WAS THE EVIDENCE LEGALLY SUFFICIENT—DID THE TRIAL COURT ERR IN DENYING THE MOTIONS OF McMURRAY, WHITING AND WILSTEAD FOR DIRECTED VERDICTS ON ALL OF THE COUNTS?

The contention is that there was not any evidence in support of the verdict. The great emphasis is that there were no false statements made in any of the documents, and that everything that they represented was true. This overlooks the fact that implicit in the offering of these documents was the representation that the numbers were represented by genuine assets and property of UCC. This was the basic misrepresentation which misled the government. Had the government known that this money was borrowed for a very short time in order to create a false impression, the commitments or guarantees would not have been issued. So, essentially the question is whether the three defendants who are here on appeal participated in the scheme.

Our conclusion is that the evidence was sufficient. The proof against McMurrray and Wilstead left little room for questioning. Wilstead borrowed money in order to make the so-called investments in UCC. This money was delivered to UCC and was deposited on a very temporary basis. It was returned to Wilstead through supposedly legitimate loans made to companies that Wilstead controlled. The money loaned was not used for the operation of these corporations. It was returned for the individuals who, in the first instance, had loaned the money to Wilstead. The purpose of these transactions was to show an increase in the paid-in capital of UCC in order that UCC could obtain the government-guaranteed funds. There is no possible reason for Wilstead to have acted unintentionally or without knowledge.

There is documentary as well as testimonial evidence that these transactions were carried out. For example, Thomas Huntsman's testimony goes a long way in establishing this. Mr. Huntsman was associated with Wilstead in his enterprises. He worked closely with Wilstead throughout. He described the workings of these transactions, the obtaining of the capital and the return of it. He described the loans, for example, that were made by UCC to Olympic Modular Builders, a corporation of Wilstead's, and that UCC did not demand repayment of the loans, but converted them into stock. This witness was not necessarily cooperative, but when specific questions were asked him, he gave straight answers.

There is also ample testimony that McMurray had full knowledge and in fact originated the circular funding scheme or approach. He was very much a part of the entire plan. He prepared or participated in the preparation of many of the documents which were necessary to carry out the plan. Furthermore, there was evidence that McMurray and Wilstead conferred regarding the execution of the plan. In fact, there is strong evidence that these two conspired to carry out the scheme. Had there not been a working agreement between the parties, it would have come to a halt. It cannot be said that there is insufficient evidence to support the conspiracy because the existence of an agreement or approval by each of the parties is evident from the various documents and from the fact of their having conferred.

The evidence as to Whiting was somewhat less substantial. However, there is sufficient evidence, both testimonially and documentary, that Whiting played a role in the preparation and documentation necessary to the full execution of the plan. He signed or endorsed many of the checks and other forms which were used to make the misrepresentation to the government. Whiting took the position that as far as he knew, all of the transactions were bona fide—were arms-length business transactions which involved the issuance of stock for capital contributions and the grant of loans based on valid UCC authority which followed SBA procedures. Whiting's signature appears on many of the vital documents. Additionally, there is testimony that Whiting was present at least one meet-

ing with McMurray and Wilstead where the mechanics of one of the loan transactions were developed.

It is quite true that inferences have to be drawn from basic facts in connection with Whiting as well as the others, but from the fact that he had cooperated in carrying out the fraudulent scheme, it cannot be said that there is a lack of evidence to support his guilt of both the conspiracy and the substantive offenses. Thus, it was within the province of the jury to find him and the other defendants guilty as charged.

An unusual factor in this case is that the defendants' scheme may have appeared to them to be foolproof in that, formally at least, it gave an appearance of validity in that there were no patently false representations. The false representation was implicit. It represented that the assets contained in the documents presented to the SBA represented genuine assets when in fact a substantial part of the capital was not truly owned. It was just present. Thus, this was in the nature of a confidence game. The money was there and soon it wasn't.

### III.

### DID THE TRIAL COURT ERR IN RECEIVING HEARSAY EVIDENCE (THE DECLARATIONS OF COCONSPIRATORS)?

■■■ The contention of the appellants appears to be that the judge failed to make a formal finding of existence of a conspiracy as a foundation for admitting statements of coconspirators applicable to other members of the conspiracy. We are fully aware of the rule that in order for a declaration of one coconspirator to be admissible against another, it is essential that the conspiracy must be first established by independent evidence. Also, the statements must have been made during the course and in furtherance of the conspiracy charged. If the conspiracy has terminated, the purported statements of the coconspirators would be hearsay and inadmissible. *See United States v. Andrews,* 585 F.2d 961, 964

(10th Cir. 1978); *Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974).

■■■ We, of course, recognize the importance of a finding that a conspiracy has been established by independent evidence as a prerequisite for statements of coconspirators. The difficulty here is that the appellants have failed to cite any evidence of statements of coconspirators purportedly made during the continuation of the conspiracy. If no such evidence was offered or received, it follows that there was no need for the trial court to have made a finding. We have examined the record, but have not discovered any such offensive testimony.

We get the impression that appellants are seeking to obtain a ruling in the abstract. We are, of course, unable to rule on a hypothetical problem. Accordingly, we conclude that the contention lacks merit.

### IV.

### THE TRIAL COURT'S INSTRUCTION ON CHARACTER EVIDENCE—WAS IT ERRONEOUS?

We hold that it was not. The court's instruction was as follows:

Where a defendant has offered evidence of good general reputation for truth and veracity or honesty and integrity or as a law-abiding citizen, the jury should consider such evidence along with all the other evidence in the case. Evidence that a defendant's reputation for truth and veracity or honesty and integrity or as a law-abiding citizen has not been discussed or that such traits of the defendant's character have not been questioned may be sufficient to warrant an inference of good reputation as to those traits of character. Evidence of a defendant's reputation inconsistent with those traits of character ordinarily involved in the commission of the crime charged may give rise to a reasonable doubt since the jury may think it improbable that a person of good character in respect to those traits would commit such a crime. The jury will always bear in mind that the law never

imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

■ The essence of the defendant's contention is that the instruction failed to use certain language, particularly, that it omitted the statement contained in the tendered instruction, "*Evidence of good character alone* may be sufficient to raise a reasonable doubt whether the defendant is guilty, which doubt otherwise would not exist." (Emphasis supplied.) In our view the trial court did not depart substantially from that even though it did not include the word "alone." The court in effect communicated to the jury that a good reputation is capable of generating a reasonable doubt. The court did not say that any other evidence was required. So, then, while it would have been helpful if the trial judge had included the word "alone," he did not, and in our view what the trial court said was adequate.

Our decision in *Bird City Equity Mercantile Exchange v. United States*, 338 F.2d 790 (10th Cir. 1964), appears to hold that the word "alone" is indispensable. The trial court in *Bird City* refused a requested instruction that character evidence, when considered with all of the other evidence, may alone create a reasonable doubt. The court of appeals reversed and said that this court (the Tenth Circuit), without deviation, has followed the rule that when a defendant in a criminal case offers evidence of good character, it is prejudicial error not to instruct the jury that such evidence, when considered with other evidence, may in itself be sufficient to create a reasonable doubt.

In some ways the instruction that the trial court gave here is less restrictive than that discussed in *Bird City*, which ties the "alone" feature to evidence of good character "when considered with all of the other evidence." The court in this case did not so modify the statement as to evidence of good character being capable of raising a reasonable doubt.

A case that was announced more recently than *Bird City* is *Oertle v. United States*,

370 F.2d 719 (10th Cir. 1967). The court in *Oertle* concluded that, under the particular circumstances presented, it was unnecessary to give the "standing alone" instruction. The court said that it was inconsistent to, on the one hand, tell the jury that it must consider evidence of good character together with all of the other evidence in the case, and then in the same breath say "evidence of good character, standing alone, may generate a reasonable doubt." 370 F.2d at 727.

■ It was pointed out in *Oertle* that the Supreme Court's decision in *Edgington v. United States*, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896), did not compel the giving of the "standing alone" instruction. The *Oertle* opinion also considered a later decision of the Supreme Court, *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). This case recognizes that the circumstances of a particular case may require the giving of the "standing alone" instruction. These circumstances would exist when an accused presented only evidence of good character and rested his defense upon this evidence. There may also be other circumstances which required the giving of such an instruction. The "standing alone" instruction would not be necessary, the court said in *Oertle*, where there was other non-character evidence relied on.

In the case before us there was other evidence presented by the defendant Wilstead, the purpose of which was to offset the evidence offered by the government as to his guilt of the conspiracy and the substantive offenses, such as evidence which went to his state of mind. It cannot be said, then, that he relied solely on a good character defense.

The considerations which are mentioned above adequately support the trial court's ruling on this instruction. In our judgment the giving of it was not error, and it was not prejudicial.

V.

THE INSTRUCTION ON RELIANCE OF DEFENDANT'S ON THEIR COUNSEL—WAS THIS ESSENTIAL?

Wilstead's requested for instruction No. 5 was joined in by McMurray and Whiting.

This instruction would have told the jury that where a person honestly and in good faith seeks the advice of a lawyer as to what he may lawfully do, and fully and honestly lays all the facts before his counsel, and in good faith and honestly follows such advice, relying upon it and believing it to be correct, and only intends that his acts shall be lawful, he could not be convicted of conspiracy, a crime which involves willful and unlawful intent, even if such advice of counsel was an inaccurate construction of the law.

The court did not ignore the subject of advice of counsel. Its instruction was that

Defendant claims that he's not guilty of willful wrongdoing because he acted on the basis of advice from his attorney. If the defendant before taking any action sought the advice of an attorney whom he considered competent, in good faith and for the purpose of securing advice on the lawfulness of his possible future conduct and made a full and accurate report to his attorney of all material facts of which he has the means of knowledge and acted strictly in accordance with the advice of his attorney given following his full report, then the defendant would not be willfully doing wrong in doing something the law forbids as that term is used in these instructions. Whether the defendant acted in good faith for the purpose of seeking guidance as to requests about which he was in doubt, and whether he made a full and complete report to his attorney, and whether he acted strictly in accordance with the advice received are questions for you to determine.

The defendants say that this instruction did not go far enough; that it left the jury an unfettered discretion to determine whether the defendants acted in good faith, whether they made a full and complete disclosure, and whether they acted strictly in accordance with the advice of counsel. The defendants also say that this instruction failed to instruct that reliance on advice of counsel prevents conviction of conspiracy and substantive counts, because it would eliminate the required element of

willfully doing wrong if they believed what they did was right. It is said that the appellant's instruction has been approved by the United States Supreme Court and two circuits.

■ There is no great difference between the instruction which was given by the trial court and that which was requested by the defendants. The trial court gave that which is recommended by Devitt & Blackmar. The only difference is that the Devitt & Blackmar instruction tells the jury that if they find that the defendant sought the advice of an attorney and did so in good faith for the purpose of ascertaining whether the conduct in question was unlawful, they must also find that he made a full and accurate report to his attorney of all material facts and acted strictly in accordance with the advice given following his full report. The court said that whether the defendant acted in good faith for the purpose of seeking guidance on matters about which he was in doubt, and whether he made a full and complete report and acted in accordance with the advice given, were to be treated as questions of fact by the jury.

The thrust of the argument is that counsel would prefer to have an instruction which told the jury that if the client went to a lawyer and obtained advice on a subject and thereafter acted in accordance with what the lawyer told him, he could not be convicted of conspiracy which involved willful and wrongful intent even if such advice was an inaccurate construction of the law. One can readily understand why appellants would prefer their version because it would not require the jury to find anything except that there was a good faith belief in what the lawyer said. The trial court believed that there were disputed questions of fact which the jury should determine as a basis for good faith belief. We do not see that the Devitt & Blackmar instruction is in any way in conflict with the Supreme Court's decision in *Williamson v. United States*, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278 (1907).

The judgments are, therefore, affirmed.

McKAY, Circuit Judge, dissenting:

The conflicting decisions resulting from the fortuity that this case and *United States v. Cassity*, No. 79–1077 (10th Cir. Jan. 31, 1980) were separated and assigned to separate panels on appeal dramatize the need for this court to develop a clearer and more consistent set of doctrines and governing principles to be applied to conspiracy cases. It also emphasizes the need for a reexamination of the propensity of the entire federal appellate system to treat the Double Jeopardy Clause with less openhandedness than is applied to the balance of the Bill of Rights. The potential for abuse is too great to give this admittedly difficult task anything less than highest priority. The dangers include the potential that the developing conspiracy doctrine will lead to inexcusable violations of the spirit of the Double Jeopardy Clause and wholesale circumvention of constitutional guarantees and time-tested principles of evidentiary fairness. We have before us the anomaly of opposite results in cases involving the same charges against the same parties based on a single set of factual circumstances. The factual differences emphasized in each case are without legal significance. Whether this be one "chain conspiracy" or one "plain conspiracy" on the one hand, or a series of separate conspiracies on the other hand, the fact remains that Cassity, like McMurray and Whiting, was at the hub of the alleged conspiracy. We cannot by any theory justify a holding that there is one conspiracy as to Cassity and several conspiracies as to the other hub conspirators.

As a matter of abstract precedent analysis, I believe that the majority in this case has the best of it in the application of our existing conspiracy doctrines to the facts which lie at the bottom of both of these cases. However, I concur in the conclusion in *Cassity* that a second prosecution of these defendants violates any reasonable construction of the Double Jeopardy Clause. When the conscientious members of this court have so much difficulty in determining when prior conspiracy convictions or acquittals bar additional trials, it strengthens my fears that the current conspiracy doctrine threatens the rights sought to be protected by the Double Jeopardy Clause, the Confrontation Clause, the hearsay rules, prohibitions against guilt by association, and other respected doctrines of fairness.

I believe that this second prosecution violates the Double Jeopardy Clause simply because the prosecution has used the same set of facts to wear out, grind down and keep after these defendants. In any event, I believe we ought to endorse clearly and unequivocally the proposition that whenever the double jeopardy question is fairly debatable, it ought to be resolved in favor of the application of the Double Jeopardy Clause. These two cases are prime and compelling targets for the application of that doctrine.