**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Glenn W. McMURRAY and R. Glade Whiting, Defendants-Appellants.**

**Nos. 78–1928, 78–1929.**

United States Court of Appeals, Tenth Circuit.

Feb. 10, 1981.

Keith Biesinger, Salt Lake City, Utah, for defendant-appellant Glenn W. McMurray.

Michael A. Neider, of Watkins & Faber, Salt Lake City, Utah, for defendant-appellant R. Glade Whiting.

William C. Hendricks, III, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before SETH, Chief Judge, and HOLLOWAY, McWILLIAMS, BARRETT, DOYLE, McKAY, LOGAN and SEYMOUR, Circuit Judges.

On Rehearing En Banc

SETH, Chief Judge.

These are appeals from the District of Utah in number CR–77–11 wherein the appellants were convicted in a jury trial. The appellants McMurray and Whiting urge that errors were committed by the trial court in its denial of their motions for acquittal, and as to certain instructions. They also urge that there was not sufficient evidence to support the verdicts.

Appellants McMurray and Whiting assert that the trial court was in error in its denial of their motions to dismiss on the ground of double jeopardy. The cases were based on several indictments all relating to a Small Business Investment Company.

The grand jury handed down several indictments based on applications made by the Utah Capital Corporation, which was a Small Business Investment Company, to the Small Business Administration. Each indictment in identical language alleges a conspiracy to make false entries in reports and statements in violation of 18 U.S.C. §§ 1006 and 2 to defraud the United States by frustrating the operation of the Small Business Administration. Substantive counts were also included in each.

Utah Capital was under the supervision of the Small Business Administration and was in the business of lending funds to small concerns. Under the statute (15 U.S.C. § 683) it could apply to the SBA to issue government guaranteed debentures. The amount of such debentures which could be issued by Utah Capital depended on the total of its paid-in capital and surplus. For authorization to issue debentures, Utah Capital had to apply and did apply to the SBA by an Application for Guaranty. In this application it was required to state the amount of its paid-in capital and surplus.

The Government in the indictments alleged that the defendants conspired to falsely and fictitiously misrepresent the amount of Utah Capital's capital and surplus. This was alleged to have been done by making deposits in the corporate bank account of funds which in fact were not unencumbered corporate funds but were provided by a number of persons for temporary use to increase the corporate bank deposits to support an application to issue guaranteed debentures. These advances were by prearrangement returned to the individuals within a very short time. The

application to the SBA was submitted at the time when the bank account of Utah Capital was so fictitiously increased.

The defendant McMurray was president and defendant Whiting was vice president of Utah Capital. Defendant Cassity was the attorney for the corporation. The record shows that the purpose of the conspiracy was to assemble funds in a certain agreed amount, deposit them in a bank, prepare and file the application with the SBA based on the then balance in the account, then return the funds to the individuals who had provided them for the described purpose.

The four indictments each named defendants McMurray, Whiting, and Cassity who came to be known as the "hub defendants." In each indictment there were named other defendants who it was asserted had conspired to provide one of the four segments of the total deposit. These "spoke" defendants were eight in number and were each named in but one indictment. For example, in the indictment which became case number CR–76–126, and was the first tried, defendants McMurray, Whiting, and Cassity were named with the "spoke" defendants Lindquist, Nemelka, and Solomon. It was there alleged that this group had provided $550,000.00 of the $2,185,000.00 deposit on May 21st for use in a SBA application. In CR–77–11 (the case before us) defendant Wilstead was named with McMurray, Whiting, and Cassity in providing $725,000.00, part of which was used in the same May 21st deposit of $2,185,000.00 and part used in a September deposit. The indictments in 76–126 and 77–11 both concern the same deposit to provide apparent support for the same SBA application.

In trial court case number CR–76–126 there were tried defendants McMurray, Whiting, and Cassity, the so-called "hub" defendants, as mentioned above, and others. In CR–76–126 Count I alleged a conspiracy and Counts II through V alleged false entries and aiding and abetting. After jeopardy had attached during the trial in 76–126 the court on the Government's motion dismissed all counts except the conspiracy count.

The jury in CR–76–126 acquitted defendant Cassity but convicted defendants McMurray, Whiting, and Nemelka. The convictions were appealed and became in this court 79–1655, 79–1654, and 79–1393. The cases were consolidated and the panel opinion was filed November 13, 1980.

The defendant Cassity who was acquitted in CR–76–126 was brought to trial under another of the four indictments in case CR–77–13. On motion of Cassity the trial court dismissed on the ground of double jeopardy arising from the trial in 76–126. We affirmed the dismissal on the Government's appeal in our 79–1077 with an opinion filed January 31, 1980.

The Government also sought to again try defendants McMurray and Whiting, who had been convicted in 76–126 on another of the four indictments as case number CR–77–11. Defendant Wilstead was tried in CR–77–11. He had not been tried before. The trial judge, who did not hear 77–13 (Cassity), denied the double jeopardy motions of defendants McMurray and Whiting and they went to trial. This denial, and the subsequent convictions, were appealed to this court and became numbers 78–1928, 78–1929, and 78–1930. The panel filed an opinion on March 5, 1980. 656 F.2d 540. Rehearing en banc was granted and this is the opinion on such rehearing.

We must hold that there was but one conspiracy and this was to amass the $2,185,000.00 for deposit to support the SBA application. It was assembled in segments with different groups providing funds for the purpose of supporting the Application for Guaranty. This was *the objective* of all the arrangements.

The Government asserts that there was no connection directly between the two "spoke" groups here concerned (CR–76–126 and CR–77–11), and thus each acted independently with the "hub" group. The Government thus takes the view that each arrangement with a "spoke" group for a segment of the total deposit was a separate conspiracy. It thus moves back one step from the assembly of, and the making of

the total deposit, and moves back from the submission of the application.

We are persuaded by the singleness of the ultimate objective of all the defendants. It was a narrow one and was to make the deposit to support the application to the SBA. It took a lot of arranging, some close timing, and a number of individuals to accomplish the objective, but again it was but one well defined objective. With each of the two "spoke" groups the subsidiary objective was to arrange for one segment or portion of the total deposit. The "spoke" group in CR–76–126 had no direct relationship with the group in CR–77–11; each was negotiated with separately by the "hub" group directly. All planning was directed by the "hub" defendants to the ultimate deposit and application.

In examining the scope of the conspiracy, we must look to the submission of the Application for Guaranty as the most important element. This submission was the basic aim of all the arrangements. The dollar total therein or in the supporting deposit is not significant for our purposes, but the submission was. It is apparent that all the convicted conspirators in CR–76–126 and CR–77–11 entered into the sham investment plan to support an Application for Guaranty. The success of the application influenced the "spoke" defendants' compensation or that of most of them. The indictment alleged that the "spoke" defendants would receive loans for their participation. It is thus apparent that all the defendants in both cases were concerned with the success of the application, and the whole arrangement was dependent thereon.

The proof did not show that the "spoke" defendants had any contact or connection with other "spoke" defendants. Obviously the "hub" defendants were the same. Thus as the record before us stands, there is no showing of any connection or meetings between the two groups of "spoke" defendants.

Under the authorities it is not necessary that each conspirator agree with all others or even know of the others, or have contact with each of them. *Blumenthal v. United*

*States,* 332 U.S. 539, 68 S.Ct. 248, 92 S.Ct. 154, presents fundamental issues as to the admission of evidence and its impact on the various defendants. However, on the broader questions the Court stated that participants could be convicted upon a showing of the nature of the plan and their connections with it, and "without requiring evidence of knowledge of all its details or of the participation of others." The Court continued to demonstrate several details in the conspiracy which might be unknown to some of the conspirators. This included knowledge of the participation by the unknown owner of the whiskey in the arrangement. The Court also there stated:

"By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal."

And further:

"All by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in disposing of the whiskey. True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus that he was aiding in a larger plan. He thus became a party to it and not merely to the integrating agreement with Weiss and Goldsmith."

In *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, each loan was a separate transaction complete in itself each with a separate illegal purpose and end. The only connection shown was that Brown handled all the loan applications. Each was a direct transaction, and was not part of a chain of events common in drug conspiracies.

We must again refer to the single purpose of the arrangement for the temporary use of the "spoke" defendants' funds. The defendants in both cases knew of this purpose; this was *the plan* and the agreement. Again, it was not necessary for all to know the ultimate dollar figure. It was not necessary that all know the others involved in the same purpose—those who provided oth-

er dollars. The "hub" defendants dealt separately with the groups in the accumulation of the funds, but all was for the same purpose and the separate dealings did not thereby create separate conspiracies. Nor could the Government by separate indictments divide up a single conspiracy. Thus we must hold that but one conspiracy has been shown to exist, and the defense of double jeopardy was valid.

It is apparent that the issue as to whether one or more conspiracies existed in the cases before us is to be resolved by an examination of the facts. The problem is a factual one and each case is unique. There are no general legal propositions which will decide all the cases; instead, an examination must be made on a case by case basis starting with the purpose of the conspiracy and how it was carried out. The agreement obviously is the central element of any conspiracy. The agreement includes the objective of the combination. The objective here was to defraud the SBA by the Application for Guaranty based on fictitious bank deposits. All the convicted defendants knew the objective—the purpose of the accumulation of funds, and all participated in attaining the objective. In the cases before us there were two groups seeking to accomplish the same ends. The several participants had somewhat different roles as we have described. The success of the agreement was to be the approval of the application, and all worked to this end. The facts before us with the clear objective—a single business transaction—which all participants were seeking to bring about present a very much clearer picture than do the many drug conspiracies which find their way to the courts. *See,* for example, our *United States v. Martinez,* 562 F.2d 633 (10th Cir.). We have here a limited time span with the same cast of characters throughout. The comparison must again be made with the facts in *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 S.Ct. 154, from which we have taken quotations in the preceding paragraphs. This was a conspiracy to sell whiskey provided by an unidentified owner which had come into the possession of Weiss and Goldsmith. The issue was whether there was one conspiracy to dispose of the whiskey or whether there were two conspiracies, one between Weiss-Goldsmith and the owner and another between Weiss-Goldsmith and the several salesmen. The Court decided there was one conspiracy and said:

"All knew of and joined in the overriding scheme. All intended to aid the owner, whether Francisco or another, to sell the whiskey unlawfully, though the two groups of defendants differed on the proof in knowledge and belief concerning the owner's identity. All by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in disposing of the whiskey. True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus that he was aiding in a larger plan. He thus became a party to it and not merely to the integrating agreement with Weiss and Goldsmith."

The defendants here all knew of the general plan, purpose, and aim, as we have mentioned. All were aware of the accumulation of funds for the May deposit and the purpose of the deposit. Some participated by providing different amounts of money as compared to the sales in *Blumenthal* of different quantities of whiskey. The knowledge, the awareness of the purpose and objective are the same in this case as in *Blumenthal.*

The judgments of conviction of defendant Glenn W. McMurray in CR–77–11 Utah (our number 78–1928) and of R. Glade Whiting in CR–77–11 Utah (our number 78–1929) are reversed and the cases remanded with directions to dismiss the actions and the indictments.

DOYLE, Judge, dissenting.

I respectfully dissent.

The problem is whether a prior adjudication forms a basis for claiming former jeopardy. The ultimate question is whether the several indictments involved one conspiracy or four, and so the cause has to be deter-

mined in relationship to the surrounding facts, with a view to deciding whether the indictments which are here being considered have an independent identity, or whether they are all part of a single conspiracy. The authorities, and particularly the decisions of the United States Supreme Court, must be examined and the standards and tests which are contained in those cases are to be applied to the solution.

I have no quarrel with the facts which are set forth in the majority opinion. I do feel, however, that some supplemental statement must be given for the purpose of showing the case in a light which shows my approach to the case.

On February 8, 1977, in the United States District Court for the District of Utah, an indictment was returned against Glenn W. McMurray, R. Glade Whiting, Donn E. Cassity and Robert H. Wilstead. This indictment alleged that the Small Business Administration, a United States agency charged with the administering of the Small Business Investment Act of 1958, was defrauded by the defendants. Appellants McMurray and Wilstead were convicted following a trial to a jury. Cassity was dismissed out. They were found guilty on a conspiracy count and on additional substantive counts which charged false entries in books and accounts. Two of the several substantive counts were dismissed during the trial.

McMurray and Whiting are referred to throughout the case as "hub" defendants. Wilstead, on the other hand, for the purposes of the conspiracy, is referred to as a so-called "spoke" defendant. The appeal by McMurray and Whiting pertains to their contention that the conspiracy is barred by the Fifth Amendment doctrine of former jeopardy. Various other errors are set forth in the briefs, but there is no necessity for treating these contentions here.

The instrument for carrying out the fraud was Utah Capital Corporation, which was a small business investment company organized by the hub defendants, and licensed by the SBA pursuant to 15 U.S.C. Sec. 681. McMurray was the President and Chairman of the Board of Directors of UCC, and Cassity was Legal Counsel; R. Glade Whiting was the Vice-President and Director.

The Small Business Administration sought to make private funds available to small businesses. At the same time it sought to insure the private financial interests of the owners of small business investment companies such as UCC. To achieve these purposes it guaranteed payments on debentures issued by the Small Business Administration, subject to the restriction that the total amount of debentures guaranteed at any time from an SBIC was not to exceed 200% of the combined private paid-in capital and paid-in surplus of the company. This feature is the key to the fraud that was perpetrated. Because of it the defendants sought to build up their apparent paid-in capital and surplus in order to be able to issue a greater amount of securities debentures. Following the grand jury investigation four indictments were returned, charging a total of eleven defendants. Three of these, McMurray, Whiting and Cassity, were charged in each of the four indictments, although they have not been prosecuted on all indictments. Wilstead and the other defendants, all of whom have been referred to as spoke participants in the conspiracy cases, were charged in one indictment each.

The several indictments described distinct transactions, so I contend; conspiracies to defraud the government and substantive offenses involving independent false entries in the books and records of the Utah Capital Corporation. McMurray and Whiting were charged in each of the indictments. They were the operators of UCC, and were the ones who apparently conceived the scheme. Wilstead participated only in this one transaction and had nothing to do with the prior transaction which occurred four months or so before. In this case his role was loaning the added funds to swell the paid-in capital.

Although its mechanics were the same, the amounts of money utilized and the other cover-up facts were generally distinct.

The Small Business Administration was defrauded distinctly and independently in all four transactions; each group was charged with the making and receipt of a distinct sham investment in UCC. The investment was a substantial amount of money and was not retained by UCC. It was immediately returned to the contributing defendants by way of alleged sham loans to fictitious business entities. In truth these purported loans constituted the return of moneys that had been loaned for just long enough to mislead the Small Business Administration as to the amount of paid-in capital that the corporation had. There were false entries made in the books in order to support the fraud.

UCC qualified for matching funds guaranteed by the Small Business Administration, and upon its receipt of these guarantees each of the four capital providing groups was provided with accommodation loans as consideration for their previous participation. Wilstead was no exception.

The defendants McMurray and Whiting were charged with serving as a hub in arranging sham investments by various spoke defendants. There is no showing that one group of spoke defendants was familiar with the fact that there were other transactions and other spoke participants.

In CR–76–126, United States District Court for the District of Utah, which charge is held to bar the offense here, the hub defendants and principals of UCC were charged with conspiracy to fictitiously increase UCC's paid-in capital and surplus in the amount of $550,000. The funds were raised by other defendants who were in no way involved here. They were Lindquist, Nemelka and Solomon, and the funds were reflected on UCC's books as an investment by Robert Solomon. Shortly after its receipt, the $550,000 became part of a larger $2,185,000 bank deposit, on May 21, 1973, which deposit was shown in UCC's application for guarantee submitted to the SBA on May 21, 1973. The $550,000 was withdrawn from UCC's bank account within a *very* short time after it was deposited. Thereafter the funds were returned to Solomon

and Lindquist, according to plan, through a series of bogus loans made to sham corporations controlled by Solomon, Lindquist and Nemelka. In return for this circular capitalization process, defendants Solomon, Lindquist and Nemelka received other loans from UCC. This was to compensate them for the momentary use of the $750,000.

The transaction that is here being considered, which is the subject of the indictment, occurred some months later, September, 1973. This was CR–77–11 in the United States District Court for the District of Utah, with the same hub defendants and principals, being McMurray, Whiting and Cassity, with Wilstead being the spoke defendant and financier. They were alleged to have entered into a separate agreement to fictitiously increase UCC's paid-in capital surplus by $725,000. As a result of this agreement, $200,000 became part of the May 21, 1973 bank deposit, and $525,000 became part of a second application, made in September of 1973. These funds were almost immediately withdrawn from UCC's control and returned to defendant Wilstead, the spoke defendant, through the use of sham loans to corporations controlled by him. Thereafter Wilstead received other pay-off loans from UCC to compensate him for the temporary use of the $725,000.

Similar schemes were alleged to have occurred in CR–77–13, with defendants West and Jolly participating, and CR–77–16, with defendants Rigby and Lord participating. Both of these indictments were dismissed as to McMurray and Whiting. There was a degree of co-mingling of other funds in the September transaction which is CR–77–11 in the district court. In CR–76–126 the amount co-mingled on May 21, 1973 constituted 100% of the sham capitalization employed in the alleged conspiracy. In CR–77–11, however, the amount co-mingled on May 21, 1973, constituted only 20%, $200,000, of the total $725,000. This is attributable to the fact that the sham capitalization in CR–77–11 agreement continued up to the September, 1973 UCC application, whereas CR–76–126 had nothing to do with this later period.

In June of 1978, CR–76–126, was tried to a jury before Chief Judge Fred M. Winner of the Colorado United States District Court. During the trial, on the government's motion, the court dismissed all counts of the indictment except the count of conspiracy. The jury returned verdicts of acquittal as to Cassity and guilt as to defendants McMurray and Whiting, and this is the basis for the present contention that former jeopardy precludes subsequent prosecution in the September transaction, which is the conviction which is being reviewed here.

The present case was tried to a jury in August of 1978, with the Honorable John Jurgens presiding. The jury returned verdicts of guilty as to conspiracy and as to Counts II, III, IV and VII, involving false entries and aiding and abetting, as to appellants McMurray, Whiting and Wilstead. Counts V and VI were dismissed on motion of the government. McMurray and Whiting, after entry of the judgments, moved the court for judgments of acquittal because of former jeopardy. These motions were denied, and they are now appealed.

The basic contention of the appellants is that the allegations of the various indictments are substantially identical and this called for treating the several incidents as a single conspiracy. Under their characterizations of the facts, there is only one agreement and objective, namely to obtain for UCC guaranteed debentures by allegedly increasing UCC's paid-in capital in connection with UCC's May, 1973, application for a guarantee. Since McMurray and Whiting were tried and convicted for this, they claim it is double jeopardy to convict them for the conspiracy which was established in the present case.

The government's position is, of course, that the four original indictments each charge a separate and independent agreement. Although each agreement contemplated violation of the same statute, they were separate transactions and not part of a single grand jury scheme. Therefore, the government contends that conviction for the conspiracy charged in the separate cases does not constitute double jeopardy, and that is what this dissent is all about.

We now address the question whether the several frauds are a part of one single conspiracy or are to be regarded as independent transactions, because the result reached depends upon this analysis.

The mere fact that the same hub defendants are charged with being members of the two conspiracies and that both concerned transactions with the same subject matter and overlapped in time does not establish that they are the same for double jeopardy purposes. See *United States v. Martinez*, 562 F.2d 633 (10th Cir. 1977). The Government's argument, which to this writer is valid, is that although various different parties conspire with one common hub group of conspirators, the evidence may nevertheless show that separate conspiracies were involved, and that no one combination embraced the objectives of the others. *United States v. Martinez*; *United States v. Butler*, 494 F.2d 1246, 1255 (10th Cir. 1974); *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1945).

The scope of the agreement to do unlawful acts and the scope of the conspiracy gives the answer to our question. If the evidence reveals a single over-all agreement to carry out an illegal plan or goal, then a single conspiracy may very well exist. A single plan, however, requires more dependence between the participants, and general knowledge of the spoke defendants as to the scope of the scheme or plan. Thus, this is not like a conspiracy to possess and distribute heroin and to sell it to various people. This may very likely be one conspiracy while it lasts, and in each instance the sellers that "retail" know full well of the general conspiracy and that their particular sales serve that conspiracy. If the numerous defendants participating in a conspiracy are to be brought into the fundamental scheme it is necessary that there be facts present to justify bringing all of the conspirators within the single agreement. And it would have to appear also that all of the objectives were contemplated in the one conspiracy.

The Supreme Court has spoken on this in positive terms in the case of *Kotteakos v. United States, supra,* which has facts which are similar to those before the court. The issue there was whether the petitioner suffered substantial prejudice from being convicted of a single general conspiracy by evidence which, as admitted by the government, proved to be not one conspiracy, but several of the same type and having the same subject matter, and did so through a common figure, as here. In *Kotteakos* the indictment alleged that one Brown was the central figure (the hub defendant) in a scheme to induce various financial institutions to grant credit with the intent that the loans or advancements would then be offered to the Federal Housing Administration for insurance upon applications containing false and fraudulent information. Brown pleaded guilty. He had acted as a broker for others in placing the loans, and charged five percent commission for his services. Brown obtained loans for several persons and groups of persons named in the original conspiracy indictment. The Supreme Court concluded:

> The evidence against the other defendants whose cases were submitted to the jury was similar in character. They too had transacted business with Brown relating to National Housing Act loans. But no connection was shown between them and petitioners, other than that Brown had been the instrument in each instance for obtaining the loans. In many cases the other defendants did not have any relationship with one another, other than Brown's connection with each transaction. As the Circuit Court of Appeals said, there were "at least eight, and perhaps more, separate and independent groups, none of which had any connection with any other, though all dealt independently with Brown as their agent." [*United States v. Lekacos,*] 151 F.2d [170] at 172 [(2nd Cir.)]. As the Government puts it, the pattern was "that of separate spokes meeting in a common center," though, we may add, without the rim of the wheel to enclose the spokes.

The Supreme Court further said (328 U.S. at 768, 66 S.Ct. at 1249):

The trial court was of the view that one conspiracy was made out by showing that each defendant was linked to Brown in one or more transactions, and that it was possible on the evidence for the jury to conclude that all were in a common adventure because of this fact and the similarity of the purpose presented in the various applications for the loans.

This view, specifically embodied throughout the instructions, obviously confuses the common purpose of a single enterprise with the several, though similar, purposes of numerous, separate adventures of like character.

The Supreme Court concluded that the petitioners before it had suffered substantial prejudice by being convicted of a single general conspiracy on evidence which the government admitted proved not one conspiracy, but some eight or more. The ruling was believed necessary in order to protect each defendant's right to have guilt determined on an individual basis, and thereby to avoid the dangers of transference of guilt from one defendant to another across lines separating conspiracies. We submit that if a single conspiracy for the four transactions had been here charged, and the trial had been on that theory, the defendants would be here protesting that they were being prejudiced by several conspiracies; that they were convicted of one conspiracy when, in truth, there were several, and they were thereby prejudiced. Therefore, the government is placed in a situation in which there will be protests regardless of how it proceeds.

Another Supreme Court decision which deals with this general problem is *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 S.Ct. 154 (1947). There, four petitioners and another defendant were convicted of conspiring to sell whiskey at prices above the ceiling set by regulations of the Price Administration, in violation of the Emergency Price Control Act. The evidence showed that each of the defendants had a part in arranging sales and deliveries of portions of two larger shipments of li-

quor to purchasers. The defendants were intermediaries between an unknown owner of the liquor and the tavernkeepers. The indictments alleged a single conspiracy. The issue considered by the Supreme Court was whether the evidence established that there was more than one conspiracy.

It is of interest to note that the defendants in the *Blumenthal* case who were intermediaries between an unknown owner of the liquor and the tavernkeepers were alleged to have acted pursuant to a single conspiracy. The issue addressed by the Supreme Court was whether the evidence established multiple conspiracies, and thus ran counter to *Kotteakos*.

The ruling of the court stemmed from the concept that the five defendants joined in a single conspiracy to sell whiskey at excessive prices and did so in the guise of legal sales, and the agreements involved were merely steps in the formation of the larger and ultimately general scheme. The court said the scheme was, in fact, the same one. The court added that the determining factor was that the salesmen knew, or must have known, that others unknown to them were sharing in so large a project. The court said further that by their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, even though they did not know its exact limits. *Blumenthal* differed from the *Kotteakos* case in that in the latter each loan was an end in itself, separate from others, although were alike in having similar illegal objects. With the exception of Brown, the common figure, no conspirator was interested in whether any loan, except his own, went through, and no one aided in any way, by agreement or otherwise, in procuring another's loan. The court concluded:

> The conspiracies, therefore, were distinct and disconnected, not part of the larger general scheme, both in the phase with Brown and in the absence of any aid given to any others, as well as in specific object and result.

The court also said there was no drawing of all (participants) together in a single, overall comprehensive plan.

It is to be concluded from reading the above two decisions that the distinguishing feature in this type of case is some knowledge on the part of the spoke participants as to the general scope of the alleged goals of the general conspiracy. One cannot be said to agree to join a conspiracy to achieve illegal objectives without general knowledge of the scope of a larger plan and what is involved in the plan. Thus, there must be interdependence among the conspirators in reaching the ultimate objective of the conspiracy, and this serves as a basis for imputing knowledge of the larger plan to peripheral participants and ties all of them together in one scheme.

But in the case before us there is a complete lack of evidence as to the knowledge of the spoke defendants of the other transactions. None of the defendants charged with putting up the money, which was the main feature in the conspiracy in four separate indictments, had any knowledge that McMurray and Whiting were engaged in any similar transactions involving the money of other people, which transactions also misled the Small Business Administration. The separate transactions appear to have proceeded independently and to have had, as well, an independent character and identity. The success or failure of each transaction was not dependent upon the success or failure of the others.

The facts of the case here are very close to those in *Kotteakos*, where a core group of individuals was involved in distinct transactions with a variety of unrelated other persons.

This court in *Bartlett v. United States*, 166 F.2d 928 (10th Cir. 1948) considered a fact situation in which the appellants, along with another individual, were convicted under a charge of conspiracy to violate federal laws having to do with the rationing of sugar. They had previously been convicted on a conspiracy charge involving another scheme to manipulate entries of credit in the sugar account. They contended that double jeopardy precluded the second conviction. This court disagreed. It determined that the evidence justified the conclusion that separate agreements were entered into, rather than that there was a

single large conspiracy. The test for determining whether the offenses charged were identical was stated to be whether the facts alleged in one, if offered in support of the other, would sustain a conviction. When one indictment requires proof of a fact which the other indictment does not, the conclusion is that the several offenses charged are not identical for double jeopardy purposes.

The same evidence test is admittedly broader than the test that is discussed by the Supreme Court in *Kotteakos* and *Blumenthal*, but it nevertheless has been used to a great extent, even though recently there has been some criticism of it. See *United States v. Papa*, 533 F.2d 815 (2nd Cir. 1976); *cert. denied* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329. The criticisms have been made in the course of considering narcotics conspiracies, and in those cases there is potential for prosecutorial splitting of conspiracies, due to the nature of the relationships involved. It would appear that in narcotics cases it has been regarded more logical to proceed on the theory of the conspiracy being one rather than several. In the *Papa* case the claim of double jeopardy was raised when the defendant was convicted of a charge of conspiring to traffic in narcotics. He claimed the conviction was barred because of a previous conviction on a guilty plea to another indictment which involved conspiracy to traffic in narcotics. The court found that the defendant was the director of two unrelated chains distributing narcotics, and the mere fact that he supervised each did not transform two separate conspiracies into one.

A more recent case in the Second Circuit is *United States v. DeFillipo*, 590 F.2d 1228 (2d Cir. 1979), *cert. denied* 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288. The court there recognized that the government was not empowered to prosecute a defendant for conspiracy twice where there is a single agreement, but two crimes. The court rejected, however, the defendant's double jeopardy argument, because it determined that there were two separate distinct conspiracies to commit the same substantive offense, and although it acknowledged that the same evidence test was not necessarily applicable, it considered the relationship to be two transactions. It held that there had been independent agreements involved in each case, rather than one continuing conspiracy.

In summary, the evidence here discloses independent transactions, the use of independent funds in the fraud and the obtaining of an independent result. The spoke defendant Wilstead is not shown to have known of other transactions. The two transactions here being scrutinized occurred at different times with a different financier, and a distinct act of misleading the Small Business Administration.

After all, the ultimate question should be whether the transactions are identical whereby an adjudication of one bars the other. I maintain that the facts show that each of these has its own identity.

I am authorized to state that Circuit Judge McWILLIAMS and Circuit Judge BARRETT concur in the foregoing dissent.